S. D. FERGUSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 51299. Filed May 23, 1957.

*Fortescue W. Hopkins, Esq.*, for the petitioner.
*Hubert E. Kelly, Esq.*, for the respondent.

ATKINS, *Judge:* The respondent determined a deficiency in income tax for the calendar year 1951 in the amount of $60,171.69. The primary question at issue is whether the petitioner is entitled to a business bad debt deduction in the amount of $118,503.10 under section 23 (k) (1) of the Internal Revenue Code of 1939. Alternatively, the petitioner contends that to the extent of $100,000 this amount represented payment of his liability as endorser on a note and that to that extent he is entitled to a deduction under section 23 (e) (2) of a loss sustained in a transaction entered into for profit.

### FINDINGS OF FACT.

The parties have filed stipulations of facts which are found accordingly and are incorporated herein by this reference.

The petitioner is an individual residing in Roanoke, Virginia. For the calendar year 1951 he filed an individual income tax return with the then collector of internal revenue for the district of Virginia.

The petitioner was born in 1863. He has a married son, M. W. Ferguson, age 57, who lives with the petitioner in the same household.

The petitioner came to Roanoke in 1883 and his initial employment was with the Bank of Virginia for about 12 or 18 months. After leaving the bank the petitioner engaged in buying at a discount interest-bearing scrip issued to employees of the city of Roanoke. Later the petitioner engaged in financing small enterprises. He advertised as a private banker, accepted deposits, and made small loans. As the result of regulatory legislation of the State of Virginia with respect to private bankers, enacted in 1920, the petitioner ceased referring to himself as a private banker, and ceased accepting checking accounts. He did, however, thereafter make loans to individuals and to enterprises.

Since going to Roanoke in 1883, the petitioner has been interested at one time or another over the years in various business enterprises. These ventures involved coal, oil, insurance, zinc mining, produce marketing, plumbing, water power, cleaning and pressing, buying and selling real estate for his own account, both for investment and for resale, construction of buildings, manufacture of overalls, manufacture of flooring, highway construction, etc. He rendered financial assistance to many individuals and businesses.

It had been a practice of the petitioner to acquire stock of various corporations with his brother-in-law, E. M. Funkhouser (who died in 1940), and other associates for investment purposes. He alone, or with Funkhouser, or others, organized numerous corporations, 25 or more; was an officer of many of them; and had a controlling stock interest (either alone or with others) in most of them. He did not engage in the active operations of any of these businesses, but was interested in seeing that they were properly financed; and he aided them by loans and by endorsing their notes. The advances to enterprises in which the petitioner owned an interest were seldom made on notes, and interest was not charged. Loans were commonly made for short terms without interest, as, for example, to meet payrolls.

One of the companies which the petitioner assisted financially and in which he owned a stock interest was the Noland Company which was organized about 1925 to engage in the plumbing and mill supply business. At that time the petitioner guaranteed a loan of $50,000 to L. U. Noland. In 1934 the petitioner, in connection with the opening of a branch of the Noland Company in Roanoke, purchased $15,000 of stock in the company, and helped Noland place an additional $15,000 of stock. He was not an officer of the corporation and did not participate in its affairs, except as a director for which he received no salary. The company was highly successful, and the petitioner has through the years received dividends therefrom in the

amount of $463,000. The petitioner owns approximately a one-tenth interest in the corporation.

Since the petitioner left the employment of the Bank of Virginia, he has continuously, until the present date, maintained an office. Since 1904 he has had a staff consisting of an office secretary and J. A. Martin who acted as his secretary or assistant. The petitioner and Martin Brothers share office space equally in a 1-story office building owned by the petitioner. The front window bears two inscriptions, "S. D. Ferguson" and "Martin Brothers, Contractors." Martin has kept records of all of the petitioner's business and personal financial activities, and has continuously kept the petitioner informed as to his financial position and transactions. He took care of the daily receipts, deposits, and disbursements and the accounting therefor, and prepared tax returns. As the petitioner had substantial real estate interests, Martin also attended to the petitioner's obligations on the leases. In addition he served as nominal officer in several of the corporations in which the petitioner owned an interest In 1951 Martin was devoting all his time to the affairs of the petitioner with the exception of approximately 1 day a week which he devoted to the contracting business of Martin Brothers in which he was interested as a stockholder and officer. The petitioner is one of the executors of the Estate of E. M. Funkhouser. He and such estate own certain property jointly and this property is under the petitioner's management. Martin also kept records of the estate. During 1951 the office secretary's work was distributed among Martin Brothers, Contractors, the Estate of E. M. Funkhouser, and the petitioner.

The petitioner maintained a complete double entry system of bookkeeping on the cash basis. Included were cashbooks, journals, and ledgers. Daily entries were made by the office secretary under Martin's supervision. The books cover a period commencing prior to 1917 and extending to the present. From these books Martin was able to prepare daily and monthly financial statements and trial balances.

Through the years the petitioner has been prominent in the civic affairs of Roanoke. His reputation has been that of a businessman who would take advantage of any good investment opportunities that were presented to him. He was always considering various projects and business ventures and seeking to invest his money. He was frequently consulted by persons seeking to promote various ventures. It has been the petitioner's general practice to go to his office daily, open the mail, turn all checks and bills over to Martin, and receive information, reports, and statements from Martin with respect to deposits, daily bank balances, tenants of the petitioner's properties,

etc. He discussed with Martin any of his affairs which needed attention. Then he made himself available to any businessmen who might desire to consult him about business projects in which they were interested with a view to having him finance them.

However, insofar as shown, the petitioner did not, from the time of his investment in the Noland Company in 1934 and through the taxable year involved, promote or incorporate any new enterprises, except certain corporations set up by himself and his son which were engaged in the manufacture of cinder blocks, which will be referred to hereinafter. After 1931 the only loans made by the petitioner were to his son and the cinder block companies in which they were interested. After 1943 the only notes guaranteed by the petitioner were those of his son and the cinder block companies.

Over the years the petitioner made many advances to and guarentees for his son. He started his son in business. Some of the investments of the petitioner were made in the name of his son and he also advanced money in the name of his son. The petitioner maintained an account on his books entitled "M. W. Ferguson" wherein loans and repayments were recorded.

The petitioner has been connected with the manufacture of cinder blocks and allied masonry products ever since he and his son incorporated the Stone Tile Company about 1926. The son was president and the petitioner was vice president of that company. That company subsequently went into receivership and the petitioner acquired its assets.

In 1938 the petitioner and his son organized Cinder Block, Inc. of Roanoke (CB) and the assets acquired from the Stone Tile Company were transferred to it. In 1938 the petitioner and his son also incorporated West End Real Estate Co. (WERE). Later, in 1945, the petitioner and his son organized the Pre-Shrunk Masonry Sales Corp. (PSMS). These 3 companies were organized for the manufacture of masonry products. Since the incorporation of these companies the petitioner and his son have owned substantially all the stock at all times, with a minor exception which is unexplained. The petitioner advanced some of the money to his son to cover part of the son's initial investments therein. Some of the stocks which the son acquired in the cinder block companies were gifts from the petitioner. The petitioner placed his son directly in charge of the operations of these companies. The petitioner was not active in the operations but served as consultant and as a source of financial assistance, and made frequent trips to the plants for discussions with his son. The son was at all times a director and the president and general manager of all 3 corporations. The petitioner was a director and vice president of WERE during all the years of its existence,

but was neither an officer nor director of CB and PSMS (except in 1938 and 1939 when he was a director and vice president of CB). WERE merged into CB in 1950.

WERE leased land and other assets to CB. CB leased assets, building, and manufacturing equipment to PSMS. PSMS manufactured and sold cinder blocks. The rental paid by CB to WERE and by PSMS to CB was based upon production.

In addition to the initial financing of these 3 companies the petitioner continued to loan additional money as business needs required and also endorsed notes of those companies. The advances to these 3 corporations were reflected merely by a charge on the books without the issuance of any notes, and the petitioner did not charge interest. No security was ever required.

From 1939 through 1945 the loans were limited practically entirely to CB, ranging from $5,700 to $22,000 per year. The advances made by the petitioner to CB, the repayments, and the year-end balances due the petitioner for 1946 through 1950, were as follows:

| Year | Advances | Repayments | Ending balance |
|---|---|---|---|
| 1946 | $54,000 | $34,000 | $20,000 |
| 1947 | 41,500 | 40,000 | 21,500 |
| 1948 | 9,000 | | 30,500 |
| 1949 | 179,000 | 30,500 | 179,000 |
| 1950 | 25,000 | 10,000 | 194,000 |

There were no advances made to CB during 1951.

The advances made by the petitioner to PSMS, the repayments, and the year-end balances due the petitioner for 1947 through 1951, were as follows:

| Year | Advances | Repayments | Ending balance |
|---|---|---|---|
| 1947 | $25,000 | $25,000 | |
| 1948 | 19,000 | | $19,000 |
| 1949 | 23,500 | 42,500 | |
| 1950 | 57,500 | | 57,500 |
| 1951 | 71,100 | 50,000 | 78,600 |

The advances made by the petitioner to WERE, the repayments, and the year-end balances due the petitioner for 1946 through 1949, were as follows:

| Year | Advances | Repayments | Ending balance |
|---|---|---|---|
| 1946 | $6,631 | | $6,631 |
| 1947 | 1,800 | | 8,431 |
| 1948 | | | 8,431 |
| 1949 | 10,000 | $20,000 | (1,569) |

From 1947 through 1951 the petitioner guaranteed notes on behalf of these 3 corporations and his son as follows:

| | | |
|---|---|---|
| 1947____M. W. Ferguson | | $15, 000 |
| 1948____M. W. Ferguson | | 60, 000 |
| 1949____PSMS | | 20, 000 |
| 1949____WERE | | 75, 000 |
| 1950____WERE | | 25, 000 |
| 1950____CB [1] | | 100, 000 |
| 1951____M. W. Ferguson | | 50, 000 |

[1] Assumed liability of WERE.

The above liability of WERE in the amount of $100,000 which was assumed by CB arose in connection with the construction of new plant facilities undertaken in 1949 to increase production of cinder blocks. PSMS, as agent for CB, commenced a program of repair and modernization of plant facilities. The cost of the work was to be borne ultimately by CB, which advanced a portion of the necessary construction funds. On December 1, 1949, WERE borrowed $75,000 from the First National Exchange Bank of Roanoke to provide funds for construction of the new plant facilities. This loan was evidenced by a note of WERE in that amount. The note was made payable to M. W. Ferguson and endorsed by him and also by the petitioner. On March 31, 1950, WERE borrowed an additional $25,000 from the same bank and a new note for $100,000 was executed. Again M. W. Ferguson was payee and the note was endorsed by both him and the petitioner. WERE was in a sound financial condition when it borrowed both those amounts. These loans were made by the bank on the strength of the credit of the petitioner.

In December 1950, WERE was merged into CB, and CB assumed the liability on the note. CB then executed a note to the bank for $100,000 and the WERE note was surrendered. Again, on this note M. W. Ferguson was payee, and both he and the petitioner were endorsers. A renewal note in the same form and containing the same endorsements was executed by CB on April 26, 1951. Renewal notes executed by CB on August 26, 1951, October 23, 1951, and November 2, 1951, which notes were held by the bank, were made payable to the order of the petitioner, and were endorsed by him only.

On July 25, 1950, the principal structure of the plant collapsed causing injury to employees and extensive damages to new and old buildings. PSMS recovered a judgment against the contractor who had done the construction work, but the damage to CB's facilities had been so great and its recovery from the suit so relatively small that its financial picture had changed. Whereas previously it had a small surplus, it had a deficit in excess of $300,000 by November 17, 1951. CB was thereby rendered insolvent and was forced to liquidate on December 31, 1951. It was unable to meet the loans and advances

made to it by the petitioner. Since CB was unable to meet the payment on the note due the bank on November 17, 1951, the petitioner on that date paid the $100,000 note of CB to the bank under his liability as endorser of CB's note. The remaining assets of CB were applied against the liability owing to the petitioner, which includes the $100,000 paid by the petitioner on his endorser's liability, leaving an unpaid balance due the petitioner of $118,503.10. The petitioner has never received any dividends on the stock which he held in the 3 cinder block companies.

A very substantial part of the petitioner's income consists of rent. He had acquired real estate for investment as well as for resale profit. In 1951 he owned substantial real estate (either fully or on a 50 per cent ownership with the Estate of E. M. Funkhouser) which was rented on leases with terms varying up to 35 years. Some of it was property acquired by him in the 1890's. The petitioner, himself, usually negotiated the leases. He devotes only a small amount of his time to his rental properties since they are generally of long term and the tenants undertake most of the upkeep. He owns many downtown business properties, including lots, in Roanoke.

Subsequent to 1951 the petitioner continued to consider the possibility of entering into other projects. Some of the propositions which the petitioner considered but which did not materialize were the construction of a building for occupancy by the Graybar Electric Co., the construction of warehouses for local merchants, and the construction of service stations for the Texas Company.

In 1952 the petitioner purchased $1,000 of stock in a corporation which constructed a downtown parking garage. This was financed by stock subscriptions by members of the merchants association, and by a loan from an insurance company. The petitioner's business properties were not near this garage location. In 1953 a second downtown parking garage located near the petitioner's properties was constructed and the petitioner was influential in its success, and invested $5,000 therein.

In his income tax return for the year 1951 the petitioner's reported gross income was as follows:

| | |
|---|---:|
| Income from rents | $90,992.77 |
| Income from dividends | 47,286.74 |
| Income from interest on Government bonds | 1,875.00 |
| Miscellaneous income | 65.64 |
| Total gross income | 140,220.15 |

Of the income from dividends $43,492 was from the Noland Company and the balance was from investments in stocks of various corporations in which the petitioner took no active part by way of operation or financing.

In his return for 1951 the petitioner took as a deduction an amount of $133,908 (the proper amount of which the petitioner now concedes to be $118,503.10) as "business bad debt" owing from CB. In the notice of deficiency the respondent disallowed the claimed deduction stating that the amount "is a short-term loss in accordance with the provisions of section 23 (k) (4) of the Internal Revenue Code."

The petitioner in 1951 was not engaged in the trade or business of promoting, organizing, managing, financing, and making loans to businesses, nor was he engaged in the trade or business of lending money. No part of the amount of $118,503.10 represents a debt the loss from the worthlessness of which was incurred in a trade or business carried on by the petitioner.

### OPINION.

The petitioner's primary contention is that he is entitled to deduct the amount of $118,503.10 in full as a business bad debt under section 23 (k) (1), Internal Revenue Code of 1939. The respondent contends that the debt is a nonbusiness debt under section 23 (k) (4) and hence is to be considered as a loss from the sale of a capital asset held for not more than 6 months. [1]

It is well established that an individual, to be entitled to a deduction of a business bad debt, must show that the loss resulting from the debt's becoming worthless bears a proximate relation to a trade or business in which he was engaged in the year in which the debt became worthless. Regs. 111, sec. 29.23 (k)-6 [2] (derived from H. Rept. No. 2333,

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

\* \* \* \* \* \* \*

(k) BAD DEBTS.—

(1) GENERAL RULE.—Debts which become worthless within the taxable year; \* \* \* This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. \* \* \*

\* \* \* \* \* \* \*

(4) NON-BUSINESS DEBTS.—In the case of a taxpayer other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than \* \* \* a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

[2] \* \* \* A non-business debt is a debt, other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business or a debt evidenced by a security as that term is defined in section 23 (k) (3). The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business is a question of fact in each particular case. The determination of this question is substantially the same as that which is made for the purpose of ascertaining whether a loss from the type of transaction covered by section 23 (e) is "incurred in trade or business" under paragraph (1) of that section.

The character of the debt for this purpose is not controlled by the circumstances attending its creation or its subsequent acquisition by the taxpayer or by the use to which the borrowed funds are put by the recipient, but is to be determined rather by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt is not a non-business debt for the purposes of this section.

77th Cong., 2d Sess., p. 76, 1942–2 C. B. 431), approved in *Hickerson* v. *Commissioner*, (C. A. 2) 229 F. 2d 631, *Jan G. J. Boissevain*, 17 T. C. 325, and *Hadwen C. Fuller*, 21 T. C. 407. While Congress did not define the term "trade or business," it is made clear in the committee reports that it was not intended to encompass all activities engaged in for profit, but was used in the limited sense of an actual trade or business. *Commissioner* v. *Smith*, (C. A. 2, 1953) 203 F. 2d 310, certiorari denied 346 U. S. 816, and *Wheeler* v. *Commissioner*, (C. A. 2, 1957) 241 F. 2d 883, affirming T. C. Memo. 1955–138. The question whether a debt is one the loss from the worthlessness of which is incurred in the taxpayer's trade or business depends upon the facts in each particular case. *Higgins* v. *Commissioner*, 312 U. S. 212; *Commissioner* v. *Smith, supra; Dominick J. Salomone*, 27 T. C. 663; Regs. 111, sec. 29.23 (k)–6.

It has been recognized that a worthless debt resulting from a loan by a stockholder to a corporation may qualify as a business bad debt if the stockholder was engaged in the trade or business of promoting, organizing, managing, financing, and making loans to business enterprises. *Giblin* v. *Commissioner*, 227 F. 2d 692, reversing T. C. Memo. 1954–186; *Henry E. Sage*, 15 T. C. 299; *Vincent C. Campbell*, 11 T. C. 510. However, as pointed out in *Charles G. Berwind*, 20 T. C. 808, affirmed per curiam (C. A. 3, 1954) 211 F. 2d 575, and *Dominick J. Salomone, supra*, the authority of such "promoter" cases is "applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a business separate and distinct from the business carried on by the corporations themselves." See also *Samuel Towers*, 24 T. C. 199; *Langdon L. Skarda*, 27 T. C. 137; *Edward Koppelman*, 27 T. C. 382; and *Hickerson* v. *Commissioner, supra*. The business of the corporation is not considered to be the business of the stockholders. *Burnet* v. *Clark*, 287 U. S. 410; *Dalton* v. *Bowers*, 287 U. S. 404; *Commissioner* v. *Smith, supra;* and *Jan G. J. Boissevain, supra*. Furthermore, it has been held that the management of one's investments, however extensive, does not constitute a trade or business. *Higgins* v. *Commissioner, supra*, and *Commissioner* v. *Smith, supra*.

The petitioner has adduced evidence showing, as set forth in our Findings of Fact, that since 1883 he has been interested in many enterprises involving a variety of businesses. He, alone or with others, organized numerous corporations and aided them by loans and by endorsing their notes. He was an officer of many of them and had a controlling stock interest, either alone or with others, in most of them. He did not, however, engage in the active operations of any of these ventures. In making loans to corporations in which he owned an

interest, the petitioner customarily did not take back notes and charged no interest. He maintained an office and an office staff, and kept records of his various transactions. He testified in effect that he never ceased to consider the possibility of other projects. On the basis of these facts, the petitioner contends that he was in the business of managing, promoting, and financing corporations, and considering and seeking out profitable ventures; that such business continued throughout the taxable year 1951; and that consequently the amount of $118,-503.10, representing the unpaid indebtedness of CB to him, was proximately related to that business and is therefore deductible as a business bad debt.

As pointed out hereinabove, we are concerned with the question whether the loss resulting from the debt's becoming worthless bears a proximate relation to a trade or business in which the petitioner was engaged in the year in which the debt became worthless. It is quite evident that all the activities, except as related to the cinder block companies, took place in years long before the taxable year in question, 1951. In fact, it appears that after 1934 the petitioner did not promote or incorporate any new enterprises except the cinder block companies; that after 1931 the only loans made by the petitioner were those to his son and the cinder block companies; and that after 1943 the only notes guaranteed by the petitioner were those of his son and of the cinder block companies. Whether the petitioner was engaged in a business of promoting, organizing, managing, financing, and making loans to businesses in the earlier years, it is unnecessary to decide. We are satisfied from a consideration of all the evidence that the petitioner's activities in 1951 and the immediately preceding years were not so extensive as to amount to the conduct of a business of promoting, organizing, managing, financing, and making loans to businesses. In this respect the situation is similar to that in *Hadwen C. Fuller, supra,* in which we stated at 412:

Over a 30-year period petitioner has promoted, financed, and managed several corporations and has been interested in and has advanced capital to several other business enterprises. But this business activity on the part of the petitioner was spread over the years, most of it taking place long prior to 1947. Petitioner has not shown that his activities in promoting, financing, managing, and making loans to corporations or business enterprises were sufficiently extensive in and around 1947 and 1948 to constitute a trade or business in and of itself. * * *

We think that the petitioner made the advances to the cinder block companies and endorsed the note of CB because of his investment in those companies. The making of the loans to these companies and the endorsement of their notes did not in and of themselves constitute a business (see *Burnet* v. *Clark, supra*), nor did they represent a part of a business consisting of promoting, organizing, managing, financing, and making loans to businesses. See also *Wheeler* v. *Commissioner,*

442

*supra*, in which, as here, the taxpayers owned stock of corporations engaged in a particular business and the taxpayers made advances to, and guaranteed loans for, one of the corporations which became bankrupt. It was held in that case that the loans and guarantees were not made to further any promoting business of the stockholders but merely to assist the corporation in its business.

We accordingly conclude that no part of the amount of $118,503.10 represents a debt the loss from the worthlessness of which was incurred in a trade or business carried on by the petitioner. The respondent's determination that the debt in question was a nonbusiness bad debt within the meaning of section 23 (k) (4) is approved.

The petitioner contends, in the alternative, that $100,000 of the amount in question represents payment of his liability as an endorser of the note of CB, and that as such it is deductible under section 23 (e) (2) of the Internal Revenue Code of 1939,[3] as a loss incurred in a transaction entered into for profit. However, the Supreme Court has recently resolved this issue by holding that a guaranty loss is to be treated as a loss from a bad debt, *Putnam v. Commissioner*, 352 U. S. 82, and, relying upon *Spring City Foundry Co. v. Commissioner*, 292 U. S. 182, that a bad debt is not deductible under section 23 (e) (2) since the provisions of the Code relating to bad debts and losses are mutually exclusive.

In view of our holding upon the principal issues presented it becomes unnecessary to consider certain other alternative contentions or to find facts with regard thereto.

*Decision will be entered for the respondent.*

---

[3] SEC. 23.  DEDUCTIONS FROM GROSS INCOME.
    (e) LOSSES BY INDIVIDUALS.—In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise—
    \*      \*      \*      \*      \*      \*
    (2) if incurred in any transaction entered into for profit, though not connected with the trade or business; \* \* \*