John F. Douglas and Laura W. Douglas v. Commissioner.
Douglas v. Commissioner
Docket No. 64661.
United States Tax Court
T.C. Memo 1958-35; 1958 Tax Ct. Memo LEXIS 195; 17 T.C.M. (CCH) 143; T.C.M. (RIA) 58035; February 28, 1958
*195 Petitioner John F. Douglas was the majority stockholder of a corporation organized on January 7, 1946, to manufacture toys. The original capital of the corporation was $2,500. In February of 1946, petitioner began making substantial advances to the corporation. Petitioner advanced to the corporation $60,000 in 1946; $65,000 in 1947; and $49,950.38 in 1948. Held: on the facts, the advances were contributions to capital and not loans. Charles F. Hartsock, Esq., 1704 Carew Tower, Cincinnati, Ohio, for the petitioners. W. Ralph Musgrove, Esq., for the respondent. BRUCE Memorandum Findings of Fact and Opinion BRUCE, Judge: Respondent determined deficiencies in the income tax of petitioners as follows: Year
Deficiency
1951
$4,560.86
1952
7,568.06
1953
5,698.82 The issue for decision *196 is whether petitioners sustained business bad debt deductions of $83,307.66 in 1950 and $27,000.00 in 1952 resulting in net operating loss carry-overs in the taxable years 1951, 1952 and 1953. Findings of Fact Most of the facts have been stipulated and are so found. Petitioners are husband and wife, residing at 628 Lexington Avenue, Terrace Park, Ohio. Their joint returns for the calendar years 1951, 1952 and 1953 were filed with the director of internal revenue for the first district of Ohio, at Cincinnati, Ohio. In the early part of the year 1946, petitioner John F. Douglas (hereinafter referred to as petitioner) became a shareholder in an Ohio corporation known as Tech-Art, Inc., and gave part-time service as an officer and director of Tech-Art, Inc. from that time forward and throughout the years herein involved. Tech-Art, Inc., was incorporated on January 7, 1946, with a beginning capital of $2,500 obtained by the issuance of 25 of the 500 authorized shares of capital stock with a par value of $100 per share. Of the original 25 shares of stock issued, petitioner owned 23 shares, his wife owned 1 share, and Allen Lloyd owned 1 share. During the period from 1946 through *197 1949, petitioner advanced varying sums of money to Tech-Art, Inc., and accepted its demand notes for such advances. The advances made by petitioner amounted to the following sums in each of the years 1946 through 1949: Year
Advance
1946
$60,600.00
1947
65,000.00
1948
49,950.38
1949
19,500.00
The advances made by petitioner to Tech-Art, Inc., in 1946 were made on the dates and in the amounts as follows: Date
Amount
February 4
$ 2,500.00
April 2
1,000.00
April 20
5,000.00
May 9
2,000.00
May 23
2,000.00
June 7
5,000.00
June 26
6,000.00
July 2
10,000.00
August 14
5,000.00
August 27
5,000.00
September 17
5,000.00
October 7
5,000.00
October 26
5,000.00
November 8
1,000.00
November 15
1,000.00
December 31
100.00
Total
$60,600.00
The advances made by petitioner to Tech-Art, Inc., in 1947 were made on the following dates and in the following amounts: Date
Amount
January 31
$ 3,000.00
March 31
7,000.00
May 31
5,000.00
June 30
5,000.00
July 31
15,000.00
August 31
10,000.00
September 30
5,000.00
October 31
15,000.00
Total
$65,000.00
Tech-Art, Inc., was incorporated under the laws *198 of Ohio for the purpose of manufacturing and selling toy specialty items. The business began losing money from the beginning of its operations. On its Federal income tax returns for the calendar years 1946 to 1949, inclusive, Tech-Art, Inc., reported net losses from operations as follows: Year
Net Loss
1946
($15,908.03)
1947
( 37,440.51)
1948
( 13,223.65)
1949
( 35,835.97)
From May 19 through May 29, 1950, Tech-Art, Inc., sold its complete toy inventory to Silverman Jobbing Corporation of Chicago, Illinois, and abandoned completely the business of manufacturing and selling toys. Thereafter, Tech-Art, Inc., continued to exist as an Ohio corporation, and subsequently experimented with various lines of manufacturing, particularly machine shop activities, throughout the period involved herein. Petitioner continued to make advances to the company. For the calendar years from 1950 to 1955, inclusive, Tech-Art, Inc., reported on its Federal income tax returns net losses or income from operations as follows: Year
Net Income or Loss
1950
($29,010.67)
1951
( 5,216.46)
1952
19,252.75
1953
( 4,477.35)
1954
( 24,993.60)
1955
( 9,871.58)
*199 During the year 1950, petitioner considered that notes of Tech-Art, Inc., held by him and his wife and issued during the years 1946 and 1947, amounting in all to the sum of $125,600, were worthless. Petitioner deducted on the joint 1950 income tax return filed by them the sum of $83,307.66 as a business bad debt. The amount of the deduction was arrived at by deducting from the total amount of the notes from Tech-Art, Inc., the sum of $35,162.66, representing the value of land and buildings located in Milford, Ohio, which were transferred by Tech-Art, Inc., to petitioner in 1949, and the sum of $7,129.68, representing amounts owed by petitioner to Tech-Art, Inc., on open account. Petitioners carried over on their 1951 income tax return the amount of $69,883.34 as an unused net operating loss carry-over. During the year 1952, petitioner considered that additional notes held by him from Tech-Art, Inc., in the total sum of $27,000, representing advances by petitioner to Tech-Art, Inc., from January 13, 1948, to June 17, 1948, were worthless. Petitioners deducted the said notes on their tax return for the year 1952 as a business bad debt. Petitioners carried over on their 1952 income *200 tax return the amount of $50,511.49 as an unused net operating loss carry-over. Petitioners carried over on their 1953 income tax return the amount of $51,578.24 as an unused net operating loss carry-over. After the sale of the toy inventory in 1950, Tech-Art, Inc., had assets in the following amounts on the dates indicated: Date
Amount of Assets
December 31, 1950
$37,006.22
December 31, 1951
47,348.88
December 31, 1952
57,564.07
December 31, 1953
55,635.08
Petitioner took no steps to liquidate the company and distribute these assets. The notes payable account of Tech-Art, Inc., reflected a balance due petitioner and his wife in the following amounts on the dates indicated: December 31, 1950
$158,389.95
December 31, 1951
167,018.97
December 31, 1952
155,518.97
Petitioner did not at any time receive any dividends or salary from Tech-Art, Inc., for services rendered to that company. After petitioner took over the land and buildings from Tech-Art, Inc., in 1949, that corporation paid him a rental of $229.50 per month. Petitioner maintained business offices in the Tech-Art, Inc., building and in a building occupied by Splain & *201 Lloyd, Inc., another Ohio corporation. Secretaries at Tech-Art, Inc., and Splain & Lloyd, Inc., handled petitioner's business affairs for him. Petitioner did not employ a private secretary to look after his investments. In 1934, petitioner acquired a one-third stock interest in Splain & Lloyd, Inc., a corporation engaged in the business of manufacturing medical supplies. Petitioner was a director of the company and held the office of Treasurer. During the period 1946 through 1952, petitioner devoted approximately 20 per cent of his working time to Splain & Lloyd, Inc., and he received a salary for his services ranging from $1,800 to $3,000 per year. Petitioner has engaged in the plumbing fixture business as an officer of John F. Douglas Company, Cincinnati, Ohio, and as an investor in McKee Plumbing Supply Company, in Cleveland. In 1949, petitioner personally guaranteed several bank loans of Spray-O-Matic Products Company, a corporation located in Cincinnati, Ohio. He rendered consulting and financing services to this company until 1952, at which time he purchased all of the stock of the company. Petitioner devoted approximately 10 per cent of his time to the service of Spray-O-Matic. *202 In 1950, petitioner was engaged by the J. B. Blood Company, a wholesale grocery business located in Lynn, Massachusetts, as an independent business consultant and manager. Petitioner performed managerial services such as balancing inventories, putting in new equipment, and other services for a period of 15 months. During this period, petitioner spent most of his time with the Blood Company and he received a business consultant fee for his services. In 1951, petitioner formed a partnership with Wayne L. Bachman and Walter E. Splain under the name "Apple Lane Subdivision" for the purpose of developing a residential subdivision in Milford, Ohio. The partnership constructed 32 houses on land owned by petitioner and the partnership operation was profitable. In 1953, petitioner and Bachman formed a similar partnership under the name "Garfield Avenue Project" to build houses. This partnership was not profitable. In 1953, petitioner organized a business known as Multifold, Inc., to lease packaging machinery to the manufacturers of cartons. Petitioner contracted with an English company to manufacture this type of equipment in England. During the years 1945 to 1949, inclusive, petitioner *203 traded extensively in listed stocks and securities. These transactions involved approximately $330,000 and 75 sales. Respondent determined that the advances made by petitioner to Tech-Art, Inc., during 1946 and 1947 in the amount of $125,600 and in 1948 in the amount of $27,000, were capital contributions rather than loans, and that the losses, if any, attributable to such advances were capital losses subject to the limitations of section 117 of the Internal Revenue Code of 1939. Respondent disallowed the deductions claimed for net operating loss carry-overs in the years 1951, 1952 and 1953 on the grounds that petitioner had failed to establish the worthlessness of the advances which formed the basis of any loss or that such losses were attributable to the operation of any trade or business regularly carried on by petitioner. In the alternative, respondent determined that petitioner's advances to Tech-Art, Inc., constituted nonbusiness debts so that any loss resulting therefrom is considered a short-term capital loss for the year in which the debts became worthless. Opinion To overcome the presumptive correctness of respondent's disallowance of the claimed deductions for net *204 operating loss carry-overs in the years 1951, 1952 and 1953, petitioner must prove: (1) that the advances made by him to Tech-Art, Inc., in the years 1946, 1947 and 1948 were loans and not contributions to capital; (2) that certain of these advances became worthless in 1950 and 1952, the years in which deductions for worthless debts were claimed; and (3) that the claimed losses resulting from the worthless debts were attributable to the operation of a business of lending money regularly carried on by petitioner. Petitioner has failed to carry this burden. When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out to establish a business, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at the risk of the business. Isidor Dobkin, 15 T.C. 31, affd. (C.A. 2, 1951), 192 Fed. (2d) 392. The formal characterization of such advances as loans may be a relevant factor, but it should not be permitted to obscure the true substance of the transaction. Sam Schnitzer, 13 T.C. 43, affd. (C.A. 9, 1950), 183 Fed. (2d) 70. *205 Thus, where the formal capital of a corporation is inadequate to carry on the business for which it was formed and where the ratio of indebtedness to capital indicates that the corporation is clearly undercapitalized, the inference is even stronger that amounts formally characterized as loans were in reality contributions to capital. The Colony, Inc., 26 T.C. 30, affd. (C.A. 6, 1957), 244 Fed. (2d) 75. The facts disclose that Tech-Art, Inc., had an original paid-in capital of $2,500. Within a month after the company was incorporated, however, petitioner began making substantial advances to it. By the end of 1946, petitioner had advanced a total of $60,600 to Tech-Art, Inc. In 1947, petitioner advanced an additional $65,000 to the company and in 1948, he made advances of $49,950.38. The land and building occupied by the corporation were worth in excess of $35,000 in 1949 when they were transferred to petitioner. At the beginning of the taxable year 1950, Tech-Art, Inc., had supplies on hand in excess of $28,000. There is also testimony in the record that Tech-Art, Inc., incurred substantial advertising expenditures. Although this evidence as to the amount *206 of assets and actual operating expenses of Tech-Art, Inc., during the early years of its operations is sketchy, it is sufficient to show that the original capital investment in Tech-Art, Inc., was inadequate to start and maintain a toy manufacturing business. Without petitioner's advances, the company would surely have collapsed in 1946. It is further significant that the ratio of indebtedness of Tech-Art, Inc., to its authorized capital was more than 50 to 1 at the end of 1947. Since the indebtedness was represented by demand notes held by petitioner, any attempt on the part of petitioner to enforce payment of the notes would have rendered Tech-Art, Inc., insolvent. Instead of demanding payment, however, petitioner continued to make advances to the company during the period 1946 to 1949, inclusive, even though it was operating at a net loss throughout these years. From these facts, the inference is clear that petitioner intended to risk the advances in the enterprise and to recover his investment if the company proved profitable. We therefore hold that the advances made by petitioner to Tech-Art, Inc., in the years 1946, 1947 and 1948 were not loans but were contributions to capital. *207 Thus respondent correctly determined that any losses attributable to the advances made by petitioner to Tech-Art, Inc., in 1946, 1947, and 1948, were capital losses subject to the limitations provided by section 117 of the Internal Revenue Code of 1939. Because the advances were not loans, it follows that there could have been no valid deductions for worthless debts and that respondent correctly disallowed the deductions claimed for net operating loss carry-overs in 1951, 1952 and 1953. In view of the above holding, it is unnecessary to decide whether petitioner proved that certain of his advances to Tech-Art, Inc., became worthless in 1950 and 1952 or whether he proved that he was in the business of making loans. We note, however, that Tech-Art, Inc., had assets of $37,006.22 in 1950, $47,348.88 in 1951, $57,564.07 in 1952, and $55,635.08 in 1953; that petitioner took no steps to liquidate the assets; that Tech-Art, Inc., continued as a going business and even made a profit in 1952; and that petitioner continued to make advances to the company. Even assuming that the advances were loans, it does not appear, therefore, that petitioner established the worthlessness of any such loans *208 in the years 1950 and 1952. See Higginbotham-Bailey-Logan Co., 8 B.T.A. 566. Similarly, assuming that the advances were debts and that the worthlessness of some of these debts had been established, it does not appear from the evidence of petitioner's business dealings that the losses resulting from the worthlessness of the debts have a proximate relation to a trade or business carried on by petitioner. See S. D. Ferguson, 28 T.C. 432. Decision will be entered for the respondent.