Sam Iaconetti and Jeanne Aronson (formerly Jeanne Iaconetti) v. Commissioner.
Iaconetti v. Commissioner
Docket Nos. 68733, 68734.
United States Tax Court
T.C. Memo 1960-100; 1960 Tax Ct. Memo LEXIS 188; 19 T.C.M. (CCH) 532; T.C.M. (RIA) 60100; May 24, 1960
*188 Held, that a mining business was not carried on by the petitioner or by him and other individuals, but was carried on by their corporation, that amounts paid by the petitioner to the corporation or on its behalf constituted either investments in its stock or nonbusiness loans to it, and that losses sustained by petitioner on such investment or debts as a result of insolvency of the corporation in 1954 are deductible only to the extent provided in section 1211 of the Internal Revenue Code of 1954. Don O. Russell, Esq., 408 Olive Street, St. Louis, Mo., for the petitioners. Drew R. Tillotson, Esq., for the respondent. ATKINS
Memorandum Findings of Fact and Opinion ATKINS, Judge: The respondent determined deficiencies in income tax and additions thereto for the calendar years 1952, 1953, and 1954 as follows: Additions to Tax, I.R.C. 1939
Docket
Sec. 294
Sec. 294
Sec.
Number
Year
Income Tax
(d)(1)(A)
(d)(1)(B)
294(d)(2)
68733
1952
$6,541.96
$130.00
$272.52
68733
1953
2,106.72
$160.69
68734
1954
3,967.57
167.02
The principal allegations of error in the original petitions related to the action of the respondent in disallowing a deduction of $113,281.65 claimed by the petitioners as a business bad debt owing *189 from the Lawrence County Mining and Milling Co., a corporation, and the consequent disallowance of a net operating loss carryback from the year 1954 to the years 1952 and 1953. By amendments to the petitions, it was in effect alleged that it was the petitioner Sam Iaconetti, and not the corporation, who was operating a mining enterprise, that the expenses and losses incurred in 1952 and 1953 in exploring, developing, and operating the mine were incurred by him and are deductible by him, and that in 1954 he is entitled to a loss deduction of $40,000 upon the abandonment and relinquishment of the mining operation and properties. There remains also the issue whether for 1953 petitioner is entitled to a deduction of $322.20 for legal and auditing expenses. Other issues raised in the pleadings have been settled by concessions of the parties, including concessions by the petitioner that he is liable for additions to tax for the years 1952 and 1954 under section 294(d)(1)(B) and for the year 1953 under section 294(d)(1)(A). For the year 1952 the petitioner also concedes that he owes an addition to tax under section 294(d)(2) if the respondent is sustained upon the principal issues involved. *190 Findings of Fact Sam Iaconetti, hereinafter referred to as petitioner, was a resident of St. Louis, Missouri, during the taxable years 1952, 1953, and 1954. Jeanne Aronson was the wife of petitioner and a resident of St. Louis, Missouri, during the taxable years 1952 and 1953, and is involved herein only because she filed joint returns with petitioner for such years. The joint returns for the taxable years 1952 and 1953 and the individual return for 1954 were filed with the district director of internal revenue, St. Louis, Missouri. Petitioner has operated a tavern and cocktail lounge in University City, Missouri, for approximately 25 years. Sometime prior to August 11, 1951, at the instance of David S. Alper, the petitioner and Alper made several trips to examine mining properties. Alper, David Mattes, and John Mattes suggested that a mine on land located in Lawrence County, Missouri, which was then being operated by the Good-Enuf Mining & Milling Company, Aurora, Missouri, hereinafter referred to as Good-Enuf, was a very rich lead and zinc mine which could be acquired through George Moore, who was president of Good-Enuf. Good-Enuf was operating the mine under the terms of a mining *191 lease dated October 7, 1948, between certain individuals as lessors and Moore and another individual as lessees, which had been assigned to it. The lease provided that it should continue so long as the lessees carried on continuous prospecting and mining operations. It contained provisions for the payment of royalties and for forfeiture for failure to keep and perform its terms. The lessees had the right to put certain buildings and machinery on the property, with the right to remove them after the termination of the lease. The lessees were given the right to assign or sublet the lease. On August 11, 1951, Good-Enuf Mining & Milling Co., party of the first part, and the petitioner, E. A. Mattes, Jr., John T. Mattes, David H. Mattes, and David S. Alper, parties of the second part, entered into a "CONTRACT OF SALE," wherein it was recited that Good-Enuf had sold to the parties of the second part all its right, title, and interest in the lease, together with the complete mining mill or concentrating plant, all buildings, machinery, equipment, and office fixtures, etc., located on the property covered by the lease. The petitioner and the other individuals agreed to pay to Good-Enuf the *192 sum of $125,000, to be paid as follows: $40,000 in cash upon execution; $30,000 within 180 days at a certain rate per ton of ore produced and sold during the 180 days, provided that if a sufficient amount of ore should not be produced, the $30,000 was to be paid in cash by the individuals; and the balance of $55,000 to be paid out of sales of ore produced and sold at a specified rate per ton. The agreement also contained the following provisions: "Second parties agree to immediately start mining operations upon said land and faithfully comply with all the terms and conditions of said original mining lease * * *. * * *
"It is expressly agreed and understood that the title and ownership of all the property herein conveyed is to remain in first party until the full amount of the purchase price has been paid and that second parties are not to assign this contract or sell any of the property herein conveyed without written consent of first party. "It is expressly agreed and understood that first party will not be liable for any debts, claims or liabilities made or contracted by said second parties in connection with said mining operations and that no lien thereby created shall attach to *193 said property herein conveyed until first parties have been paid in full for the purchase price thereof. "First party agrees that upon complete performance by said second parties and the full payment of the purchase price above reserved, to execute and deliver to said second parties, a proper bill of sale to said mining mill, machinery and equipment, clear and free of all liens and encumbrances and execute proper and legal assignments to said second parties, the mining lease above mentioned. "It is expressly agreed and understood that if second parties fail to comply with the terms of this contract or the terms of the original mining lease or fail to make the payments above reserved, then said first party shall have a right to forfeit said contract upon 60 days notice in writing and re-enter and take possession of said property." At some time thereafter in August 1951, the petitioner, as party of the first part, and David S. Alper, Ernest A. Mattes, Jr., John T. Mattes, and David H. Mattes, as parties of the second part, entered into a contract wherein it was recited that the parties were contemplating forming a corporation for the purpose of carrying on mining operations in Lawrence *194 County, Missouri, and in which it was agred that the petitioner would advance $60,000 for the purchase from Good-Enuf of the complete mining mill or concentrating plant and lease in connection therewith. It also contained the following provisions: "It is agreed between the parties hereto that in consideration of the money so advanced by the first party, that he shall receive and hold 51% of the interest in said mining mill and lease and 51% of the stock issued, if and when the contemplated corporation is formed, the remaining 49% of the stock or interest is to be equally divided among the parties of the second part. "It is expressly agreed that the first party is to receive all of the net profits from said mine subject to the contract of purchase heretofore entered into with the GOOD-ENUF mining company, until the full amount of the cash monies advanced by first party has been repaid in full. "It is further agreed that after first party receives full payment of the money so advanced by him, he is still to retain and own 51% of the interest or stock in said company or corporation, but is to receive only 33 1/3% of the dividends and profits made from said operations so that first party *195 herein may retain his interest and control to the extent herein provided but yield the proportion of difference in dividends which would otherwise be his." The initial payment of $40,000 was paid by the petitioner to Good-Enuf in 1951 by two checks, one a cashier's check for $5,000, and the other by his personal check for $35,000. On August 13, 1951, the petitioner also issued his personal check for $5,000 to Aurora Mining & Milling Co., as payee (the name selected by petitioner for the immediate operation of the project in unincorporated form), in order to get the operation started. [1] *196 On September 4, 1951, the petitioner and the other individuals organized a corporation under the laws of the State of Missouri, under the name of Lawrence County Mining & Milling Co., hereinafter referred to as the corporation, with authorized capital of $25,000 of common stock. The corporation did not keep a stock book and no stock certificates were issued. Thereafter the mining operations were carried on in the name of the corporation. It set up and maintained books and records of such mining operations, and it maintained bank accounts. Although there was no instrument executed transferring to the corporation either the agreement with Good-Enuf or any of the properties which were the subject of that agreement, such properties were recorded on the corporation's books and records by a debit to the plant and development account in the full amount of $125,000. The unpaid balance due to Good-Enuf under the contract was recorded on the books of the corporation as a loan payable to Good-Enuf, and the $40,000 which petitioner had paid under the contract was recorded on the books as a loan payable to the petitioner. Sales *197 of zinc and lead ore were recorded on the corporation's books and records, and when such sales were made on credit, invoices of the corporation were issued. Purchases were billed to the corporation and were shown on its books as accounts payable. The records of operation of the corporation over the period September 1951 to October 1952 show gross income of $156,471.73, expenses of $179,667.03, and a net loss of $23,195.30. The petitioner does not have a degree in mining engineering and has no technical knowledge regarding mining operations. He has never made any advances to mining enterprises other than the one here in question. During the course of these particular mining operations, the petitioner made trips to the mine every week end and made decisions with reference to its operations, including a decision to open another mine shaft in order to achieve a peak of continuous production. As the operations became more difficult, the petitioner in the spring of 1952 purchased a home near the mine site, moved his furniture there, resided there, and spent more time supervising the mining operations. As ore was mined and sold the proceeds were used to pay for the operation of the mine. *198 Whenever these receipts proved insufficient, the petitioner furnished funds to meet the operating expenses. In addition to the two checks for $35,000 and $5,000, which petitioner issued to Good-Enuf and the initial check of $5,000, which he issued in the name of Aurora Mining & Milling Company to start operations, the petitioner over the period September 6, 1951 through September 23, 1952, issued 27 checks totaling $84,165.90 in connection with the mining operation. Of this number, 23 checks totaling $66,720 were issued directly to the corporation which deposited them in its bank account and drew against them for various operating expenses, including salaries, and to purchase equipment, $12,000 being used to purchase a diesel tractor, a dump body and a trailer. Neither the petitioner nor Alper received any salary, but David Mattes, the foreman, and Gus Mattes, the bookkeeper, each received a salary of $75 per week. The remaining checks totaling $17,445.90 were issued to a bank and others for reasons not specifically stated in the record. In addition to all the foregoing checks, the petitioner also used his own funds to acquire a cashier's check for $1,900, which was used to purchase *199 a compressor. He also used a check of A. G. Edwards Investment Broker for $10,000 to purchase trucks, a trailer, and other equipment. Thus the total of all the expenditures made by petitioner was $141,065.90. No notes or other evidences of indebtedness were ever issued to petitioner for any of the advances made by him to the corporation. However, of the total expenditures which petitioner had made, there had been recorded on the books of the corporation as of July 31, 1952, the amount of $111,320 as loans payable to him. When an auditing firm audited the books of the corporation, it found that the total expenditures of petitioner had been approximately $141,000, and it left journal entries to be made by the bookkeeper which would reflect loans payable to the petitioner in that approximate amount. As of October 31, 1952, the corporation's balance sheet showed loans payable to the petitioner of $137,239.20. At the time of the audit the books of the corporation showed $23,768.11 in the machinery and equipment account and $128,979.44 in the plant and development account. Its balance sheets over the period September 30, 1951 to October 31, 1952, show loans payable to Good-Enuf decreasing *200 from $83,346.49 to $66,560.74. By a notice dated January 16, 1953, and addressed to the petitioner and the other individuals and the corporation, Good-Enuf, by George Moore, president, it was stated that the contract of August 11, 1951, had not been complied with in certain respects, including failure to pay all of the $30,000 payment which was then past due, and notice was therein given that unless within 60 days the contract should be performed, an action would be commenced in court by Good-Enuf to forfeit all rights thereunder. The petitioner then made a demand upon Moore for a statement of account. By letter dated March 12, 1953, Good-Enuf, by Moore as president, furnished a statement showing "Payments from Ore Sales by Iaconetti, Alper and Mattes on Purchase Price of Good-Enuf Mining and Milling Co." in the amount of $21,469.10, leaving a balance due on the $30,000 payment of $8,530.90. The mining operations were not successful and at a time not disclosed by the record bankruptcy proceedings involving the corporation were instituted in the United States District Court for the Western District of Missouri, and the entire mining operation ceased. In connection with the bankruptcy *201 proceeding Good-Enuf filed a motion for an order of reclamation or surrender of all the property described in the contract of August 11, 1951. The petitioner had filed a motion for an order declaring such properties to be those of the bankrupt and declaring Good-Enuf to be an unsecured creditor with respect thereto. On January 11, 1954, the referee in bankruptcy filed an order decreeing that the property was not the property of the bankrupt and that Good-Enuf should be permitted to assert, in whatever manner it desired, its claim against such property free and clear from any claimed jurisdiction of the bankruptcy court over the property. The corporation filed a Federal income tax return for the taxable year beginning September 4, 1951 and ending July 31, 1952, with the district director of internal revenue at St. Louis, Missouri. Therein it reported gross sales of $144,958.70, cost of goods sold in the amount of $59,207.12, and gross profit from sales of $85,751.58. It claimed deductions of $127,340.11, which included compensation of officers of $9,450.61, and salaries and wages of $35,676.26. Its attached balance sheet included the lease at $25,000 as a depletable asset, depreciable *202 assets at $159,282.77, and common stock outstanding in the amount of $25,000. In the return the petitioner was named as president, Alper as vice president, and the three other individuals as officers or directors. It was stated that petitioner and Alper devoted part of their time to the business of the corporation and that the other three individuals devoted all of their time to it. In answer to questions on the return, it was stated, among other things, that the corporation was a successor to Good-Enuf, that petitioner owned 51 per cent of the stock, and that he acquired such stock on September 4, 1951. In his income tax returns for the taxable years 1952, 1953, and 1954 the petitioner did not claim, as expense deductions, any of the amounts which he had expended as above set forth. In his return for 1954 he claimed as a bad debt deduction under section 166(a)(1) of the Internal Revenue Code of 1954, an amount of $113,281.65, as representing advances made to the corporation which became worthless in 1954. In an attachment to his return the petitioner alleged that he was engaged in the business of financing profit ventures, citing other enterprises, namely, a wholly owned cafe corporation, *203 a restaurant of which he was the sole proprietor, and a mining corporation in which he owned all the stock. He therein stated that he was the majority holder of the stock of the corporation (Lawrence County Mining & Milling Co.) and that he advanced funds to it. In his 1954 return the petitioner also reported a capital loss of $25,000, representing 500 shares of common stock of the corporation purchased in August 1951, at a cost of $50 per share. He claimed a deduction of $1,000 thereof for 1954, and reported $24,000 as representing a capital loss carryover to 1955. In a protest sworn to by the petitioner and received by the respondent on June 11, 1956, the petitioner stated that he had contributed the entire $25,000 of capital of the corporation, that he received 51 per cent of the stock, his associates receiving the remaining 49 per cent, and that he loaned additional money to the corporation for operation. In the notice of deficiency, the respondent disallowed $322.20 of amounts claimed by the petitioner as a deduction for 1953 for legal and auditing expenses, with the explanation that this amount represented payment of legal fees on behalf of the corporation and as such are not *204 deductible by petitioner as an ordinary and necessary business expense. In the notice of deficiency, the respondent made no adjustment to the capital loss deduction claimed in the 1954 return in the amount of $1,000. However, he disallowed and restored to taxable income of 1954 the claimed bad debt deduction in the amount of $113,281.65. He determined that the petitioner had a nonbusiness bad debt in that year of $112,561.40, but held that since this item was properly to be treated as a capital loss and that since the petitioner had already claimed the maximum capital loss allowable for 1954, no amount was deductible in 1954 on account of such bad debt. The mining business hereinabove described was conducted by the corporation as was intended by the petitioner and the other individuals who were parties to the contract of August 11, 1951, and such business was not conducted either by the petitioner or by him and the other individuals. The corporation became insolvent during the taxable year 1954. Any investment of the petitioner in the capital of the corporation and any debts owing to him from the corporation became worthless in 1954. Opinion At all times up to the date of the hearing *205 in this case the petitioner had represented in his returns, protest, and pleadings that the mining operations here involved were carried on by the corporation, that he had invested $25,000 in the capital stock thereof, that he had made loans to the corporation in the amount of $113,281.65 and that in 1954 he had a capital loss on the stock of $25,000 and a business bad debt loss of $113,281.65. By amendment to the pleadings made at the time of the hearing, he adopted an entirely different theory, namely, that the business was not that of the corporation, that he and his associates carried on the business, that all the expenditures which he incurred in connection with the operation were either expenses or losses incurred by him in carrying on his own business, and that he is entitled to deduct such losses and expenses as incurred in the years 1952, 1953, and 1954, specifically alleging that the $40,000 which he personally paid to Good-Enuf constituted a loss to him in 1954 upon abandonment or relinquishment of the mining operations and properties. On brief his theory was further altered to the extent of claiming that his total personal outlays over the period 1951 through 1954, namely *206 $141,065.90, constituted a business loss in 1954 with a consequent net operating loss for that year which may be carried back to the years 1952 and 1953. We have set forth in detail the facts relating to the mining operations. To us the conclusion is inescapable that it was the corporation which was carrying on the business, and we have so found as a fact. It is clear that the petitioner and his associates intended to organize a corporation to carry on the business, and that the corporation was organized shortly after they had acquired the mining lease and properties. The corporation was not merely a clearing house for the expenses of operation by the individuals, as now claimed by the petitioner. It was a bona fide corporation which held itself out to the public as conducting the business. It maintained bank accounts and received money from the petitioner which it used to purchase property and to defray cost of operations, including the payment of compensation and wages to officers and others. Ore was sold in its name and purchases were made on its own invoices. It was treated by the petitioner and the other individuals as being the entity which conducted the business. Its activites *207 were substantial and continuous until it became involved in bankruptcy proceedings. It filed an income tax return for the fiscal year September 1951 to July 31, 1952, in which it was stated, among other things, that petitioner was its president, owning 51 per cent of the stock. It is true that no stock certificates were issued, but the interests of the individuals in the corporation are clearly established by the contract among them. It is not essential that stock certificates be issued in order to make one a stockholder. Federal Grain Corporation, 18 B.T.A. 242. The petitioner stresses the fact that the contract of August 11, 1951, by its terms precluded its transfer, or transfer of its subject properties, without permission of Good-Enuf, prior to payment of the full purchase price, that there was no document assigning to the corporation the contract or the subject properties, and that on January 11, 1954, the bankruptcy court decreed that the properties were not those of the bankrupt corporation. From this he argues that the corporation had no property or assets, that the ore when produced did not belong to it, and that accordingly it cannot be considered as conducting any business *208 in connection therewith. Ownership of the property used by a corporation is not a prerequisite to the conduct of the business by it. It is clear that the petitioner and the other individuals caused the corporation to use the properties and conduct the mining operations, and both they and the corporation treated such properties as if they were owned by the corporation, the corporation entering them on its books as depletable or depreciable assets, and recognizing an obligation to pay the remaining balance to Good-Enuf and to repay petitioner for his initial outlay. It was the corporation which actually extracted the ore and sold it. And it may be added that the corporation did own other properties used in its business which it had purchased out of monies furnished by the petitioner. It is well established that a corporation is a taxpayer separate and distinct from its stockholders and that the corporate entity may be disregarded only in exceptional circumstances, such as where it is a sham or unreal. Burnet v. Clark, 287 U.S. 410; Burnet v. Commonwealth Improvement Co., 287 U.S. 415; and Moline Properties, Inc. v. Commissioner, 319 U.S. 436. There are no circumstances here which *209 would justify ignoring the reality and separateness of the corporation, or treating its business as that of its stockholders. The corporate records reflect all, or practically all, of the petitioner's expenditures, amounting to $141,065.90 (including the $40,000 which petitioner originally paid to Good-Enuf), as loans owing to the petitioner. The respondent in the notice of deficiency held that the corporation was indebted to the petitioner in the amount of $112,561.40 and that the petitioner had an investment in the capital of the corporation of $25,000. The respondent concedes that the corporation became insolvent in 1954 and that any loss on account thereof was sustained in that year. In our view of the case, it is not necessary to determine how much of the expenditures made by the petitioner constituted investment in stock and how much constituted loans to the corporation. To the extent that the petitioner's investment in stock of the corporation became worthless in 1954, it must be treated as a loss from the sale or exchange of a capital asset under section 165 of the Internal Revenue Code of 1954, [2] *212 the deduction of which is limited by section 1211 of the Internal Revenue Code of 1954 *210 [3] to the amount of gains from sales or exchanges of capital assets, plus the taxable income of the taxpayer or $1,000, whichever is smaller. Furthermore, deduction of losses resulting from the worthlessness of nonbusiness debts is similarly limited, since such losses are to be considered as losses from the sale or exchange of capital assets held for not more than six months. Section 166 of the Internal Revenue Code of 1954. [4] *213 In his return for the year 1954, the petitioner claimed that he was engaged in the business of financing profit ventures and that therefore the debt owing to him from the corporation, stated to be in the amount of $113,281.65, was deductible in full as a business bad debt. However, he has not shown that he was engaged in activities of promoting, financing, managing, and making loans to a number of corporations so as to be considered as engaged in such a business, or was otherwise engaged in the business of lending money. See S. D. Ferguson, 28 T.C. 432, affd. (C.A. 4), 253 F. 2d 403. Accordingly, any loss sustained as a result of loans made to the corporation is a loss from a nonbusiness bad debt, the deduction of which is limited as in the case of losses from *211 the sale or exchange of capital assets. The respondent has already allowed the petitioner a deduction of $1,000, for 1954, and the petitioner is not entitled to a greater amount on account of loss of investment in the corporation or from the worthlessness of debts owing to him from it. The argument in the petitioners' briefs is directed entirely toward the contention that it was the petitioner and the other individuals, rather than the corporation, who were operating the business and that the petitioner's total outlay of $141,065.90 became an ordinary loss deductible by him in the year 1954, and it is stated that this is the only issue. However, on brief he also makes the statement that in any event he should be allowed for 1954 a deduction for the $5,000 which was advanced by him prior to organization of the corporation and used to get the operation started, the $11,900 paid by him for machinery and equipment, and the $40,000 initially paid by him to Good-Enuf, stating that he individually sustained a loss on these items upon the abandonment of the project in 1954. He has presented no detailed argument on this point and the evidence *214 with respect thereto is incomplete. For all that appears, the expenditure of $5,000 constituted either an advance to the corporation which was to be organized or a contribution to its capital. The same is true with respect to the $11,900 which the petitioner expended for machinery and equipment; it may have been purchased in the name of the corporation or have been transferred to it. In that event these expenditures would be governed by the discussion above with respect to the limitation of loss. Presumably the contention as to the deductibility of the $40,000 item is based upon the view that the properties for which it was expended did not become the properties of the corporation, and that this remained, throughout, an investment of the petitioner in his individual capacity. But, here again the evidence is insufficient to establish the petitioner's right to a deduction in 1954 on account thereof. The properties for which the $40,000 was a down payment consisted of the lessee's rights under a mining lease, a complete mining mill or concentrating plant, and certain buildings, machinery, equipment, and office fixtures. The fact that the corporation became insolvent and that any investment *215 in it became worthless in 1954, does not necessarily mean that any investment of the petitioner in these assets became worthless in 1954 or that there was a disposition of his interest therein establishing a loss. If these properties were repossessed by Good-Enuf the record does not disclose it. We do not know what transpired after the bankruptcy court concluded that the assets did not belong to the corporation and decreed that Good-Enuf should be permitted to assert, in whatever manner it desired, its claim against such properties. We do know that the petitioner had previously indirectly acquired the lessor's interest under the mining lease through the acquisition of all the stock of Aurora Mining & Milling Co. Although the petitioner testified that the entire amount of money which he placed in the venture was lost, he did not state how or when this $40,000 was lost. In this state of the record, we cannot find or hold that the petitioner is entitled to deduct in the year 1954 the amounts of $5,000, $11,900, and $40,000. The petitioner also alleged that the respondent erred in disallowing $322.20 of the amount claimed by the petitioner in his 1953 return as legal and auditing expense. *216 We do not have any evidence whatsoever as to this, except that the respondent determined that it represented payment of legal fees on behalf of the corporation, and this item is not mentioned by petitioner on brief. Under the circumstances we cannot conclude that this amount constituted an ordinary and necessary expense of any business carried on by the petitioner, and must approve the respondent's determination of it. Decisions will be entered under Rule 50. Footnotes
1. Shortly after the commencement of operations it became apparent that it would be difficult to comply with the terms of the lease which had been acquired, and in order to eliminate this problem the petitioner by contract dated August 29, 1951, acquired, for the sum of $17,000, all the stock of a corporation which had acquired the rights of the original lessors under the lease in question. The name of this corporation was Aurora Mining & Milling Co., but is not to be confused with the above name selected for the operations to be conducted by the petitioner and his associates. Such corporation remained in existence until the time of the hearing, but is not involved herein.
2. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction. - For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. (c) Limitation on Losses of Individuals. - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; and * * *
(g) Worthless Securities. - (1) General Rule. - If any security which is a capital asset becomes worthless during the taxable year, the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset. (2) Security Defined. - For purposes of this subsection, the term "security" means - (A) a share of stock in a corporation; (B) a right to subscribe for, or to receive, a share of stock in a corporation; * * * ↩
3. SEC. 1211. LIMITATION ON CAPITAL LOSSES. * * *
(b) Other Taxpayers. - In the case of a taxpayer other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller. * * * ↩
4. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (d) Nonbusiness Debts. - (1) General Rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness Debt Defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩