Milton A. and Beatrice Mooney v. Commissioner.
Mooney v. Commissioner
Docket No. 60544.
United States Tax Court
T.C. Memo 1958-116; 1958 Tax Ct. Memo LEXIS 112; 17 T.C.M. (CCH) 631; T.C.M. (RIA) 58116; June 20, 1958
*112 Upon the facts, held, that loans which became worthless in the taxable year represented nonbusiness bad debts deductible only under section 23(k)(4), 1939 Code. Theodore M. Garver, Esq., for the petitioners. L. Robert Leisner, Esq., for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The Commissioner determined a deficiency *113 in income tax for the taxable year 1953 in the amount of $7,355.30 and additions under sections 294(d)(1)(A) and 294(d)(2), 1939 Code, in the total amount of $1,625.23. The principal question is whether a debt in the amount of $14,015 was a nonbusiness bad debt for which deduction is limited by section 23(k)(4), as respondent determined, or was a business bad debt which is deductible in its entirety under section 23(k)(1), as claimed by petitioner. Findings of Fact Petitioners, who reside in Shaker Heights, near Cleveland, Ohio, filed a joint return for 1953 with the collector of internal revenue for the eighteenth district of Ohio. Since the issues relate to Milton A. Mooney, he is referred to hereinafter as the petitioner. Petitioner has had long experience in and is well acquainted with the business of obtaining films from distributors for exhibition by independent motion picture theaters, and he knows a great deal about the business of operating motion picture theaters, and about related aspects of that business. He obtained his original experience as an employee of Warner Brothers Distribution Company. In the 1930's, for an undisclosed period, he was the manager of the Cleveland *114 office of Warner Brothers Distribution Company, which distributed films to theaters in Cleveland. During 1953, petitioner was employed by a corporation which he organized, Cooperative Theaters of Ohio, and his chief income was his salary from that corporation. However, petitioner received income from other sources in 1953, and his activities relating to other enterprises began prior to 1953. The evidence before us shows in some detail petitioner's activities prior to 1953. For convenience, there are set forth below, first, the facts relating to operations from which petitioner derived income in 1953, followed by facts pertaining to his interests before 1953: Sources of Income in 1953 The following schedule shows items of income in 1953, exclusive of dividends and interest, which were reported in petitioner's return: 1. Coop. Theatres of Ohio, salary
$18,750
2. Highway Theatres, Inc., salary
4,800
3. Highway Concessions, profit
3,300
4. Sky-High Drive In Theatre, rent
1,200
5. Fulton Amusement Co., salary
2,500
6. Academy Film Service, Inc., salary
2,600
7. WAKR-TV - booking commission
1,500
8. WHIZ-TV - booking commission
1,910
9. WTRF-TV - booking commission
900
10. Coop. Theatres of Buffalo, profit
3,712
*115 The following facts show the history and the nature of the business of the corporations which paid petitioner a salary, and the activities of petitioner in earning income as a sole proprietor: 1. Cooperative Theatres of Ohio, Inc. Petitioner is a director and a stockholder of Cooperative Theatres of Ohio, and in 1953 he was its president, secretary, and treasurer. He organized this corporation in 1938, when he acquired all of its stock for about $1,250. He owned all of the stock continuously thereafter during each year, including 1953. A few years ago he transferred about 30 per cent of the stock to his son. This corporation is still engaged in business. Cooperatives Theatres of Ohio is engaged in the business of buying and booking motion picture films for clients, which are motion picture theaters that show the films. This business is known generally as the motion picture booking business. Petitioner has been an employee, the manager of the business, of Cooperative Theatres of Ohio at all times, and he has always received a salary for his services. Cooperative Theatres of Ohio paid him a salary in 1953 in the amount of $18,750, and dividends in the amount of $7,500. From 1938 *116 through 1953, a period of about 15 years, petitioner's gross receipts from this corporation in salary and dividends have amounted to about $335,000. Petitioner is and always has been the dominating figure in the operation of the business of Cooperative Theatres of Ohio. Cooperative Theatres of Ohio carries on its business in the following way: It enters into contracts with motion picture theater concerns, which are independent exhibitors of films, under which Cooperative Theatres is authorized to book films for the exhibitor. The income of Cooperative Theatres is derived from the contracts. The services performed by petitioner for Cooperative Theatres as an employee involved calling on clients or prospective clients to arrange contracts, and obtaining films for the exhibitors under the contracts. When Cooperative Theatres of Ohio was organized in 1938 it needed funds to pay rent, wages, and other operating expenses. Petitioner advanced from $5,000 to $7,000 to the corporation for its operating expenses, for which he received notes of the corporation. The corporation repaid all of this indebtedness to petitioner before 1953. 2. Highway Theatres Company. Petitioner is a stockholder, *117 director, officer, and employee of a corporation, Highway Theatres Company. In 1953, he was treasurer and he received a salary of $4,800. Highway Theatres was organized in 1947. Upon its organization petitioner acquired one-third of its stock for $1,000. Highway Theatres has carried on a business at all times of operating a drive-in motion picture theater, which it constructed and which is known as Sky-High Drive In Theatre, on rented land which is located on the outskirts of Youngstown, Ohio, at or near Hoytville. Highway Theatres rents the property which it occupies from a partnership in which the partners are petitioner, the estate of F. H. Hathaway, and Charles Kessler. The property consists of 42 acres of land. In 1947, petitioner purchased a one-third interest in this tract of land for from $2,500 to $2,600. The tract is held by the partnership. The share of the rent produced by the tract which each partner (including petitioner) has received amounted to $1,200 per year prior to and in 1953, and $1,560 per year after 1953. Petitioner received as his share of the rent in 1953, $1,200 which he reported as paid by Sky-High Drive In Theatre. During 1947, petitioner loaned Highway *118 Theatres Company between $17,000 and $18,000, which was repaid before 1953. The services which petitioner performed for Highway Theatres Company in 1953 and in prior years consisted of buying and booking films which it exhibited, ordering its advertising, and, in general, managing its business, of which he is the general manager. 3. Highway Concessions. In 1953, petitioner and Charles Kessler organized a partnership which did business, under the name of Highway Concessions, at the Sky-High Drive In Theatre, selling candies, popcorn, hot dogs, and soft drinks. Petitioner had a 50 per cent interest in this partnership. He purchased the merchandise which was sold. This partnership took over the concession because of the dissatisfaction of petitioner and the other stockholders in Highway Theatres Company with the services of professional concessionaires. Petitioner received $3,300 in 1953 as his share of the profits of Highway Concessions. 4. Fulton Amusement Company. Fulton Amusement Company is a corporation which was organized by petitioner and two others in 1950. Upon its organization, petitioner acquired 40 per cent of this corporation's stock for $250. In 1953, petitioner *119 was a director and the manager of the corporation, and he held the office of secretary and treasurer. Fulton Amusement Company operates the Lyceum Theatre in Cleveland. It leases the theater. Petitioner obtained the lease. Petitioner's services for this corporation in 1953, and before, consisted of buying and booking films for the theater and supervising the operations. He received a salary of $2,500 for his services in 1953. The corporation ended its business in 1956. In 1950, petitioner loaned Fulton Amusement Company $7,200, for which he received a 6 per cent note. He received interest on the loan. Most of the loan was repaid. In 1950 or 1951, Fulton Amusement Company borrowed $10,000 from the National City Bank in Cleveland in order to finance some improvements. The bank required security for the loan which petitioner provided by endorsing the corporation's note and agreeing to be personally liable. The bank loan was fully repaid. 5. Academy Film Service, Inc. In 1952, petitioner acquired about 6 per cent of the stock of Academy Film Service, Inc., and his son acquired the rest of the stock. In 1953, petitioner was the secretary and treasurer of this corporation, and he *120 performed advisory services for which he was paid a salary of $2,600. This corporation is still in existence. Petitioner loaned Academy Film Service, Inc. between $6,000 and $7,000 at 6 per cent interest in 1952 and thereafter. He loaned the corporation an additional $1,080 for the purchase of a truck, which was to be repaid at the rate of $88 per month. All of these loans have been repaid. However, the loans were outstanding, in part at least, during 1953. 6. Booking Business with Television Stations. The television stations in Akron, Ohio, Zanesville, Ohio, and Wheeling, West Virginia are known as channels WAKR, WHIZ, and WTRF, respectively. When each of these television stations was opened, each contacted petitioner and asked him to purchase and book motion picture films for exhibition on the station. Petitioner accepted the business in his individual capacity. The business did not require very much of his time. It was carried on during 1953 and part of 1954. Each station paid petitioner for his services on a weekly basis the amount of $75 or $50 per week. In 1953, the total amount which WAKR paid petitioner was $1,500; WHIZ paid him $1,910.20; and WTRF paid him $900. The total *121 amount which petitioner received from the three stations in 1953 was $4,310.20. In 1954, petitioner received payments from these television stations which aggregated about $2,990. 7. Cooperative Theatres of Buffalo. In 1950, petitioner established as a sole proprietorship in Buffalo, New York, a business of buying and booking films from distributors for independent motion picture theaters. This business is carried on under the name, Cooperative Theatres of Buffalo. Its office is located in the Crosley Building in Buffalo. Upon the establishment of this business, petitioner put about $1,200 into the business which was used to buy office furniture and equipment. Petitioner was active in the business of Cooperative Theatres of Buffalo during 1953 as general supervisor but he had an employee in Buffalo. Petitioner devoted about 3 per cent of his time in 1953 to this business. The business of Cooperative Theatres of Buffalo provided a particular service to independent theaters in obtaining films, namely, the benefits of group buying and booking of films. That is to say, the clients of this concern constituted a group of theaters, and as a group dealing through Cooperative they could *122 obtain better consideration from the distributors of films than would have been true if each theater had acted independently. In his income tax return for 1953, petitioner, on Schedule C, profit from business, reported $19,950 as the gross receipts in that year of Cooperative Theatres of Buffalo; he reported total expenses in the amount of $16,237.91; and net profit in the amount of $3,712.09. The foregoing covers the sources of petitioner's income in 1953 from salaries paid by corporations, from petitioner's share of the earnings of partnerships in which he was a member, and from the business of buying and booking films for television stations and independent theaters which he carried on as an individual. In addition, petitioner received interest on a loan to Fulton Amusement Company in the amount of $362.50; and he received dividends from Cooperative Theatres of Ohio in the amount of $7,500 (which has been noted above), and dividends of $166 from Columbus North Company. 8. Columbus North Company. In 1953, petitioners and Paul Gusdamovic found a piece of property in Bedford, Ohio which was suitable for a motion picture theater. They formed a corporation, Columbus North Company, *123 and petitioner purchased one-third of the stock for $11,620. Petitioner and Gusdamovic bought the above-mentioned piece of real estate and turned it over to Columbus North Company. It was intended that the corporation would construct a theater on the land but the plan was abandoned because of the competition which would have been encountered with another theater in Bedford. Columbus North Company eventually was dissolved, after 1953, but it had earnings from rents received from the property it held, and petitioner received $166 in dividends in 1953. Petitioner was vice-president of the company. 9. Bad Debt - $14,015; Advances to C. & A. Theatre Corp. The advances of funds to C. & A. Theatre Corporation in the total amount of $14,015 are involved in the issue before us. In his return for 1953, petitioner deducted $14,015, the total of two items, $9,015 and $5,000. Petitioner explained the deduction in the following way: "For uncollectable loans made to the C & A Theatre Co., Cleveland, Ohio as guarantor of the corporation's lease from Rose McShaffery, Akron, Ohio the lessor, in 1949-1950 per corporation records. Also payment made direct to lessor, Rose McShaffery in May, 1953 *124 at final liquidation of corporation in consideration of full release as guarantor of lease." The Commissioner disallowed the deduction of $14,015. His explanation of his determination in the statement attached to the deficiency notice is as follows: "(a) It is held that the total amount of $14,015.00, claimed as a deduction on page 3 of your income tax return for the taxable year ended December 31, 1953, is not allowable under the provisions of section 23(e) of the Internal Revenue Code of 1939, but that it qualifies as a deduction only under the provisions of section 23(k)(4) of the 1939 Code. "(b) The amount of $14,015.00 is considered to be a deduction under section 23(k)(4) of the Internal Revenue Code of 1939 and is subject to the limitation of $1,000.00 imposed by section 117(d) of the 1939 Code. Since a capital loss of $625.00 has been claimed on the return an additional amount of $375.00 has been allowed." In other words, the Commissioner treated the loss of $14,015 as a nonbusiness bad debt. Under section 117(d), 1939 Code, capital losses are limited to $1,000. Since a capital loss of $625 was taken and allowed, only $375 remained available for deduction with respect *125 to the loss of $14,015 from a nonbusiness bad debt, and petitioner received a deduction of only $375. C. & A. Theatre Corporation operated the Allen Theatre, a motion picture theater, in Akron, Ohio. Petitioner organized the corporation in 1935 under the following circumstances: In 1934, petitioner and F. H. Hathaway acquired an option on a lease of the Allen Theatre, a motion picture theater located in Akron, and an option to buy the equipment in the theatre. They exercised the option and obtained the lease from a Mrs. McShaffery. The lease rental was $600 per month. C. & A. Theatre Corporation was organized to operate the Allen Theatre, and its stock was issued in equal amounts to petitioner and Hathaway, each taking 50 per cent. Petitioner paid $625 for the shares of stock which he received. The lease of the Allen Theatre was assigned to C. & A. Theatre Corporation, but under the terms of the assignment and lease, petitioner and Hathaway remained jointly liable under the lease as guarantors. Petitioner at all times was a stockholder, director, and officer of C. & A. Theatre Corporation. He was vice-president and treasurer. At all times he was active in the management and operation *126 of the corporation. He did all of the buying and booking of the films which were shown in the Allen Theatre, and he hired the employees. Hathaway, who was a traveling salesman, was not active in the management. C. & A. Theatre Corporation operated the Allen Theatre until sometime in 1953 when it became evident that the enterprise was unprofitable and should be given up. Petitioner made loans to C. & A. Theatre Corporation to provide it with funds for the operation of its business. These loans were made during 1949 and 1950. They aggregated $9,015. For each loan, the corporation gave petitioner a 6 per cent note. The loans were in the amounts set forth below: Date
Amounts of Loans
Not shown
$ 380
July 29, 1949
2,000
Dec. 15, 1949
1,250
Dec. 20, 1949
2,000
July 3, 1949
2,000
Oct. 16, 1949
1,000
Dec. 31, 1950
385
$9,015
In 1953, C. & A. Theatre Corporation was in arrears in the rentals under the lease. The remainder of the term of the lease was six years. The stockholders of the corporation decided that the theater was then a failure and would not become a profitable business again. The business of the theater had declined and, it was believed, *127 had suffered because of the popularity of television. In 1953, C. & A. Theatre Corporation was insolvent. A proposal was made to the lessor, Mrs. McShaffery, to settle the indebtedness due her under the lease and to terminate the lease. She agreed to take all of the equipment in the theater and to end the lease. With respect to the personal liability of petitioner and Hathaway under the lease, the lessor agreed to accept $10,000, payable $5,000 by each guarantor, in full discharge of their joint liability as guarantors under the lease. Petitioner and Hathaway, each, paid the lessor $5,000 in 1953 in settlement of their joint liability. C. & A. Theatre Corporation has never repaid petitioner any of its indebtedness of $9,015, and it has never paid any of the $10,000 which was paid by petitioner and Hathaway as guarantors under the lease. The indebtedness of the corporation to petitioner in the amount of $14,015 was worthless in 1953. In his determination of the deficiency, the respondent treated the above indebtedness as having become worthless in 1953, and allowed a partial deduction therefor under the limitations contained in sections 23(k)(4) and 117(d). 10. 1953 Loan to Lockhart. *128 In 1953, petitioner loaned M. E. Lockhart, a film dealer in Akron, Ohio, $1,000 at 6 per cent interest, to help keep Lockhart in business, so that certain equipment which Lockhart handled would continue to be available to Academy Films Service, Inc. Interests and Activities of Petitioner before 1953 Petitioner participated in the following activities prior to 1953: In 1924, the petitioner acquired an option on a lease covering three theater properties in Bellefontaine, Ohio, and he formed the Bellefontaine Amusement Company, a corporation, to operate the properties. The petitioner acquired approximately one-third of the stock for about $1,250. The corporation was in existence from 1924 to 1931, during which time petitioner was its president and a director. Petitioner bought and booked the pictures, hired the employees, paid the bills, and managed and supervised the theaters for the corporation. During the existence of the corporation, the petitioner derived a total income of over $20,000 from salary and dividends. In the year 1928 or 1929, the petitioner acquired a lease on a vacant theater in Bellevue, Ohio, which had gone out of business. The petitioner redecorated the *129 theater, opened it, and operated it for a short, unspecified time. Then he sold it to a man named MacIntosh, making a profit of approximately $2,500 over and above his expenses. In the same years, petitioner acquired an option on the lease of a movie theater in Painesville, Ohio. He held this option for about a year and then sold it back to the landlord, making a small profit. In about 1932, petitioner loaned the owner of a chain of theaters in Cleveland, Paul Gusdamovic, $3,000, at 6 per cent interest. Petitioner thought that the loan might help him in future business dealings with Gusdamovic. In 1936, the owner of two theaters in Bellevue, Ohio, contacted petitioner in an attempt to interest petitioner in purchasing them. The petitioner was not interested, but he offered to find another purchaser. He contacted a Meyer Fine who was then building a new theater in Bellevue, and through petitioner, the two theaters were sold to Fine. Fine paid petitioner $2,000 for his services, out of which petitioner paid his own expenses. In about 1938, the petitioner booked a game similar to "Bingo", called "Hi-Lo", to different theaters in northern Ohio. The individuals who sponsored this *130 game had asked petitioner to handle the Cleveland territory because of his distribution experience with movie theaters in the area. Petitioner made a profit of from $600 to $700 from this activity. In 1940, the petitioner sold the World Encyclopedia to motion picture theaters for such theaters to use as gifts. He made a profit of over $1,000. In about the same period, petitioner took over the purchase and booking of films at the request of the owner of three Canadian "drive-in" movie theaters. He received approximately $100 per week plus expenses for his services, which were given during a year and a half. In addition to the foregoing enterprises of petitioner at this time, he acquired a lease on the Nixon Theatre in Akron, Ohio. The Nixon Theatre Company, a corporation, was formed, and petitioner subscribed to 50 per cent of the stock for which he paid about $250. The other 50 per cent was subscribed to by F. H. Hathaway. The petitioner was president and a director of the corporation; he did the buying and booking of films, and he supervised the operation of the Nixon Theatre. The corporation went out of existence in 1946 or 1947, and petitioner, in 1952, realized a gain of *131 $2,059.31 from a liquidating dividend. In 1942 or 1943, petitioner was asked to distribute a game called "Screeno" in northern Ohio. During those years, he sold the rights to use "Screeno" to different theaters and was paid for this service on a commission basis. His total profit over expenses was $2,000. Starting in 1944, the petitioner booked films for Christmas parties and strike-bound workers for the following corporations for which he received the following profit: Petitioner's Ap-
Firm
proximate Profit
Babcock-Wilcox Company $175 to $200
U.S. Steel Fabricating Company
75 or 80
Aluminum Company of America
60 to 70
Goodyear Tire & Rubber Company
50 or 60
Pittsburgh Plate Glass Company
50 to 75
During the period 1946 through 1948, petitioner owned a 50 per cent interest in the Allen Enterprises, a partnership, which operated the popcorn and candy concession stand in the Allen Theatre, in Akron, Ohio, which was operated by C. & A. Theatre Corporation, referred to above. The petitioner invested approximately $1,000 in the venture and did the buying for the concession, in addition to supervising the sales and hiring the help. Petitioner made a total *132 profit of about $4,300. In 1947, the petitioner acquired a lease on the Crown Theater in Cleveland, Ohio. A partnership called the M.F.H. Theatre Company was formed for the operation of this theater. Petitioner contributed $5,500 for a 40 per cent interest in the partnership; there were three other partners all of whom had lesser interests. The petitioner bought and booked the films and handled the operation of the theater for the partnership. The business was not successful and the theater was closed after two or three years. In 1948, petitioner distributed a 2-reel movie for The ClevelandElectric Illuminating Company entitled "The Best Location in the Nation," which described northern Ohio. The film was distributed in those cities served by the lighting company. Petitioner was paid approximately $1,200 for his services, half of which covered his expenses. In 1950, the petitioner loaned L. J. Schlaefer, former eastern sales manager of Twentieth Century-Fox, $2,500 or $3,000 at 6 per cent interest so that Schlaefer could buy a drive-in movie theater. The loan has not as yet been completely repaid. In 1952, petitioner had the exclusive distribution rights in northern Ohio for *133 a horse racing game called "Sweepstakes," which could be played in movie theaters. He made a profit of $700 or $800 in such distribution. In the same year, a motion picture producer, Bob Leppert, came to the petitioner to offer him the distribution rights to all Leppert products in northern Ohio. Academy Pictures, a corporation, was formed to take advantage of this offer. The petitioner's son owned all of the stock. Petitioner advised the corporation, aided it in the distribution of films in northern Ohio, and in one year performed management services for which he received a salary of $2,500. Academy Pictures went out of business in 1953 or 1954. The petitioner has an office at 2108 Payne Avenue, Cleveland, Ohio, which is also used as an office for the Cooperative Theatres of Ohio, Inc. The petitioner's name and the name of the Cooperative Theatres of Ohio, Inc. both appear on the office door. Petitioner was not engaged in the separate business of promoting, financing, managing, and organizing businesses, or of loaning money, during 1953, or prior thereto. No part of $14,015 represents a debt, the loss from the worthlessness of which was incurred in a trade or business carried *134 on by petitioner in the taxable year. All of the debt of $14,015 represents a nonbusiness bad debt. Opinion The question is whether the total amount of $14,015 which petitioner advanced to or in behalf of C. & A. Theatre Corporation is deductible in full as a business bad debt under section 23(k)(1), or represents a nonbusiness bad debt, deduction for which is limited by section 23(k)(4). [1] There is no issue before us relating to the fact that the entire indebtedness became worthless in 1953. *135 All of the evidence has been carefully considered and it is our conclusion that the question here is controlled by the following authorities, and that, accordingly, the respondent properly determined that the worthless loans constitute a nonbusiness bad debt. See Jan G. J. Boissevain, 17 T.C. 325; Hadwen C. Fuller, 21 T.C. 407; S. D. Ferguson, 28 T.C. 432, affd. 253 Fed. (2d) 403; Wheeler v. Commissioner, 241 Fed. (2d) 883; and Commissioner v. Smith, 203 Fed. (2d) 310, 312. In Charles G. Berwind, 20 T.C. 808, 815, affd. 211 Fed. (2d) 575, this Court pointed out: "The authority contained in such cases as Weldon D. Smith, 17 T.C. 135, revd. 203 Fed. (2d) 310, Henry E. Sage, 15 T.C. 299, and Vincent C. Campbell, 11 T.C. 510, is applicable only to the exceptional situations where the taxpayer's activities in promoting, financing, managing, and making loans to a number of corporations have been regarded as so extensive as to constitute a businesss separate and distinct from the business carried on by the corporations themselves. *136 * * *" We have examined the record carefully to ascertain whether the instances in which petitioner made loans were so extensive as to constitute an independent promotional business of petitioner. In the taxable year 1953, apart from the loans in question, petitioner made one loan of $1,000 to an individual, Lockhart. During the years 1932 through 1952, a period of 20 years, petitioner made only two loans to individuals, one for $3,000 in 1932 to Gusdamovic, and one for about $3,000 in 1950 to Schlaefer. During the same period, exclusive of the loans at issue, he made the following loans to four corporations in which he held stock: (1) In 1938, he loaned from $5,000 to $7,000 to Cooperative Theatres of Ohio to cover operating expenses in the first years of its existence. (2) In 1947, he loaned $17,000 to $18,000 to Highway Theatres Company for undisclosed purposes. (3) In 1950, he loaned Fulton Amusement Company $7,200. (4) In 1952, he loaned Academy Film Service, Inc. around $7,000, in one instance, and $1,080 on another occasion. These loans were interest-bearing loans. We do not think that petitioner's activities during 21 years in making loans to three individuals, and to five *137 corporations in which he was a stockholder were extensive enough to establish the existence in 1953 of a separate busines of loaning money and financing enterprises, and we have so found as an ultimate fact. Dominick J. Salomone, 27 T.C. 663. We think that a comparison of the facts in Henry E. Sage, 15 T.C. 299, Vincent C. Campbell, 11 T.C. 510, and Giblin v. Commissioner, 227 Fed. (2d) 692, with the facts in the instant case makes those cases readily distinguishable. In the taxable year, petitioner was engaged in the business of buying and booking films for independent theaters. Petitioner has failed to prove that he was engaged in a separate and distinct business of loaning money and promoting and financing enterprises. With respect to his interests in various corporations in which he held stock, the fact that he was employed by several as a manager in the conduct of such corporate businesses does not serve to establish petitioner in a distinct business of promoting and financing enterprises. Commissioner v. Smith, supra; Charles G. Berwind, supra; Langdon L. Skarda, 27 T.C. 137, affd. *138 250 Fed. (2d) 429; and Hadwen C. Fuller, supra.Considering the aggregate of petitioner's activities over the period 1932 through 1953, our conclusion remains the same. Omaha National Bank v. Commissioner, 183 Fed. (2d) 899. There must be a proximate relationship of the loss resulting from a debt's becoming worthless to a trade or business in which the taxpayer is engaged in the taxable year in which the debt becomes worthless. Serving as an officer, manager, and employee of a corporation in which the taxpayer owns stock does not constitute a business of the taxpayer, even where there is such relationship of the taxpayer to more than one corporation. Ida A. Van Dyke, 23 B.T.A. 946, affd. 63 Fed. (2d) 1020, affd. 291 U.S. 642; Dalton v. Bowers, 287 U.S. 404; Burnet v. Clark, 287 U.S. 410. The purported debt of the corporation to its stockholders must be a true loan rather than a contribution to capital, a distinction which the taxpayer must take into account in his proof, particularly where his contribution to the capital of a corporation was small. The making of investments *139 in corporate ventures does not in itself constitute the conduct of a business of promoting and financing enterprises. In 1953, petitioner had investments in four corporations in which he owned stock and from which he received salaries. Upon the entire record, we cannot find and conclude that in 1953 petitioner was engaged in a business of either loaning money or promoting and financing business ventures to which business the loss from the worthlessness of the loans of $14,015 to the C. & A. Theatre Corporation was proximately related. Commissioner v. Smith, supra. It is concluded that the loans to C. & A. Theatre Corporation were not made to further any independent business of petitioner consisting of promoting, and financing and lending to business enterprises. Respondent's determination is sustained. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year; or (in the discretion of the Commissioner) a reasonable addition to a reserve for bad debts; and when satisfied that a debt is recoverable only in part, the Commissioner may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. This paragraph shall not apply in the case of a taxpayer, other than a bank, as defined in section 104, with respect to a debt evidenced by a security as defined in paragraph (3) of this subsection. This paragraph shall not apply in the case of a taxpayer, other than a corporation, with respect to a non-business debt, as defined in paragraph (4) of this subsection. * * *
(4) Non-Business Debts. - In the case of a taxpayer, other than a corporation, if a nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "nonbusiness debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩