Grant D. Fitch and Marguerite Fitch v. Commissioner.
Fitch v. Commissioner
Docket No. 71641.
United States Tax Court
T.C. Memo 1960-268; 1960 Tax Ct. Memo LEXIS 21; 19 T.C.M. (CCH) 1491; T.C.M. (RIA) 60268; December 13, 1960
*21 Petitioner, a participant in numerous business ventures, made a loan to Frank Abbate which became worthless in 1954. Petitioner received from a corporation organized by Abbate an employment contract and a share of net profits before taxes. Held: 1. Petitioner was engaged in a series of full-time business activities during 1946-1959, and his intermittent promotional activities outside his normal business routine do not put petitioner in the trade or business of promoting, organizing, and financing businesses. 2. Receipt of compensation for services although income from a trade or business, does not of itself put the recipient in the trade or business of rendering such services for the purpose of determining whether a bad debt is a business bad debt under section 166(a)(1) of the I.R.C. of 1954. Hubert L. Will, Esq., for the petitioners. Charles B. Wolfe, Jr., Esq., for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: Respondent has determined a deficiency of $2,668.20 in petitioners' income tax for the year 1954. The sole issue is whether the losses suffered by Grant D. Fitch in the amount of $6,625 on two loans to Frank Abbate constitute business *22 or nonbusiness bad debts. Findings of Fact Some of the facts have been stipulated and are so found. Grant D. Fitch, hereinafter referred to as petitioner, and Marguerite Fitch, husband and wife, filed their joint Federal income tax return for the calendar year 1954 with the district director of internal revenue at Chicago, Illinois. In 1954 substantially all of petitioner's income as reported consisted of partnership profits from the Masterform Tool Company. In the latter part of 1950, Frank Abbate organized and became the principal stockholder of Independent Fruit and Vegetable Distributors Company, hereinafter called "Independent." Being in need of funds with which to operate this fruit and vegetable distribution venture, he procured from petitioner two advances of $5,000 each, the first on September 29, 1950, and the second on December 1, 1950. Petitioner received in return two demand notes from Abbate calling for 6 per cent interest, and reciting the deposit as collateral of demand notes with identical principal amounts and dates with Independent as maker and Frank Abbate as payee. One of the two checks given by petitioner was endorsed by Independent. On October 6, 1950, petitioner *23 and Independent entered into an employment contract providing, in part: 1. INDEPENDENT will pay EMPLOYEE at the rate of Forty Dollars ($40.00) per week, commencing October 1, 1950, so long as EMPLOYEE shall continue to hold himself available as a consultant and market adviser to INDEPENDENT. 2. In addition to the foregoing fixed weekly salary INDEPENDENT agrees to pay EMPLOYEE twenty per cent (20%) of its net profits before Federal income or Excess Profits taxes as determined by the corporation's independent public accountants, such payments to be made quarterly on or before the 15th day after the end of each calendar quarter commencing with the quarter beginning October 1, 1950. At the time of such quarterly payments INDEPENDENT shall furnish EMPLOYEE with a statement showing how such payment has been computed. 3. EMPLOYEE will hold himself available for consultation and advice by INDEPENDENT provided that he shall not be obligated to devote any specific number of hours to his duties during any particular week, and shall not be obligated to devote more than one hundred (100) hours to such consultation and advice during a calendar year. The contract was for 1 year, automatically renewed *24 each year on its anniversary unless 30 days' notice to the contrary was given by either contractor. However, petitioner ceased his performance under this contract in July 1951 because of his personal dissatisfaction with the way Independent was being managed. Petitioner made the advances to Abbate with the expectation that this employment contract with Independent would be forthcoming as additional consideration for petitioner's $10,000. The parties are agreed that in 1954 the Abbate notes became worthless, with the amount of $6,625 still owing. From October 1950 until he terminated his employment in July 1951, petitioner worked several hours a day for Independent, 2 or 3 days a week, before and after his regular working hours, and averaged 6 hours of work each week. He received $1,760 from Independent for these services. Petitioner served during that time as Independent's secretary and treasurer, signed all of its checks and attended sales meetings and consulted with regard to sales to super markets. From 1946 to 1959 petitioner particpated in numerous business ventures. A record of his activity in those ventures in which he held an equity interest is summarized in the following table: *25 Year
Type of
Form of
Begun
Name of Enterprise
Business
Business
1946
Soundies Films, Inc.
Film distributors for
Corporation
coin-operated
industry
1946
Film Kraft Productions
Produced film for
Subsidiary
distribution
corporation
1947
Film Guild of America, Inc.
Distributed film for
Corporation
home use
1948
Hollywood Recorded
Recorded programs
Corporation
Features, Inc.
for radio stations
1948
Fitch & Allen Co.
Universal starting
Partnership
switches
1950
Tri-Jay Masterform Tool
Cutting tools
Corporation
Company
1951
Masterform Tool Company
Cutting tools
Partnership
1954
Monmouth Industries, Inc.
Pottery manufacture
Corporation
1955
Slidematic Products Co.
Metal stampings
Partnership
1956
Ashland Screw Products,
Screw products
Corporation
Inc.
1959
Pokorney Value Company
Value products
Corporation
Petitioner's
Period of
Year
Equity
Petitioner's
Advances
Positions
Begun
Interest
Interest
made
Held
Salary
1946
27%
[1] *26 1946-1949 None
Vice President
Up to $17,500
1946
Only through
1946-1949
None
Vice President
None
stock in par-
ent ( = 27%)
1947
30% - 33%
1947-1949
$ 7,500
Vice President
$2,200 over
Sales Manager
3 years
1948
15%
1948-1950
$ 7,500
(Officer)
None
1948
50%
1948-1958
None
None
1950
50%
[2] 1950-1951 $ 1,500
Vice President
Began at $110
Sales Manager
[3] per week 1951
50%
1951-1954
None
Vice President
$25,000 by
Sales Manager
[4] 1954 1954
6%
1954-1957
$10,000
Director
None
1955
40%
1955-1959
$ 5,000
Sales Manager
[5] Yes 1956
50%
[6] 1956-1959 $15,000
President
When finances
permitted
1959
100%
[6] 1959 $60,000
[5] Yes In 1948 petitioner and several associates from his film distributing enterprises formed several groups to finance ventures. Petitioner, as his share, loaned $7,500 to Mills Sales Company to purchase ice cream freezers, receiving interest, 10 per cent of the distributor's cost as profit, and warehouse receipts on the freezers as security. This venture successfully terminated within a year. Soundies Films, Inc., also participated in this group. Petitioner also loaned $6,250 in 1948 to U.S. Wood Kraft *27 Company, a manufacturer of coin-operated bowling machines. In addition to interest on the loan, petitioner was to receive a commission on each sale and distribution rights for the State of Illinois. The venture failed and petitioner lost $1,260. The only other loan made by petitioner other than the ones giving rise to the bad debt here in issue was a loan of $10,000 made in 1957 to Peter Heinzberger to enable the latter to buy out the other stockholder of a company known as Belmont Tool. From 1946 through 1949, petitioner's principal occupation was that of an officer of Soundies Films, Inc., and his participation in the other enterprises during that period was carried on from the Soundies Films, Inc., offices. From 1950 through 1954, petitioner's regular office routine was to spend 12 to 14 hours daily, sometimes 7 days a week, working for Tri-Jay Masterform Tool Company and its successor, Masterform Tool Company. From 1955 to 1959, petitioner's time was devoted to the sales and management of Slidematic Products Company, and his other activities gravitated about these efforts. During the 14-year period, 1946-1959, petitioner was almost continually occupied with one or another primary *28 activity, relegating the other then current enterprises to his spare time. In petitioner's income tax returns for 1951 through 1954, he describes himself as an "Executive" and in his self-employment tax computation, starting in 1952, as a "Tool Manufacturer." These returns disclose the following: Capital Gains
Interest
Income
from Sale
Relating to
Gross
from Tool
of Prior
"Promotional"
Year
Income
Manufacturing
Enterprises
Loans
1951
$21,545.92
$ 7,825.00
$7,794.67 *
$668.91 **
1952
31,598.90
27,739.42
0.00
0.00
1953
27,581.28
26,585.55
0.00
0.00
1954
40,244.58
36,032.43
0.00
0.00 Petitioner was not in the trade or business of promoting, organizing, purchasing, financing, and managing businesses in 1950 or 1954. Petitioner was not in the trade or business of market adviser or consultant during 1950 or 1954. The losses due to the worthlessness of his loans to Frank Abbate were not proximately related to any trade or business of petitioner during 1950 or 1954. Opinion Petitioner contends that his losses with respect to the loans to Abbate constitute deductible bad debts under section 166(a)(1) [1] of the Internal Revenue Code of 1954, *29 [2] based on the dual contentions that petitioner made these loans in connection with a trade or business of promoting, organizing, purchasing, financing and managing businesses, and that the loans were an integral part of a transaction producing income from a trade or business. Respondent contends that these were nonbusiness bad debts and deductible only to a limited amount under section 166(d)(1)(B). [3] *30 Petitioner seeks to bring himself within cases in which the promotional and lending activities of taxpayers have been found so extensive and continuous as to constitute a trade or business by themselves. Giblin v. Commissioner, 227 F. 2d 692 (C.A. 5, 1955); Henry E. Sage, 15 T.C. 299 (1950); Washburn v. Commissioner, 51 F. 2d 949 (C.A. 8, 1931); Burgher v. Campbell, an unreported case (N.D. Tex., 1958) 1 AFTR 2d 1579; Commissioner v. Stokes' Estate, 200 F. 2d 637 (C.A. 3, 1953); Maloney v. Spencer, 172 F. 2d 638 (C.A. 9, 1949). But these cases apply only to those instances in which the extent of the taxpayer's promotional activities is so great as to warrant a finding that such activities constituted a trade or business separate and apart from the business activities of the individual enterprises. Charles G. Berwind, 20 T.C. 808 (1953), affd. per curiam 211 F. 2d 575 (C.A. 3, 1954); H. Beale Rollins, 32 T.C. 604, affd. 276 F. 2d 368 (1960). Whether or not petitioner was engaged *31 in the trade or business of promoting, organizing, and financing business enterprises is a question of fact, Higgins v. Commissioner, 312 U.S. 212 (1941), and one in which petitioner must sustain the burden imposed by law of proving the existence of such a business. Max M. Barish, 31 T.C. 1280 (1959). In Giblin v. Commissioner, supra, relied on by petitioner the court found that the taxpayer, an attorney, spent 50 per cent of his time seeking, promoting, and financing businesses. The absence of this factor was instrumental in reaching an opposite conclusion in H. Beale Rollins, supra, and Holtz v. Commissioner, 256 F. 2d 865 (C.A. 9, 1958). Petitioner here has testified that from 1950 through 1954 he spent 12 to 14 hours daily, sometimes even 7 days a week, in his tool manufacturing business, and his promotional activities were sporadic and squeezed into his regular business routine. Similarly, the taxpayer in Burgher v. Campbell, supra, was found to have spent about half of his working hours in promotional activities. Henry E. Sage, supra, also relied on by petitioner, involved a taxpayer who, after receiving a substantial bequest, persisted in valiant but generally unsuccessful *32 attempts to augment his legacy. This Court found a continual search for uses for his time and money, which were the working assets of his business. In Washburn v. Commissioner, supra, the taxpayer worked full time in the alleged promoting business. Maloney v. Spencer, supra, was decided on the ground that taxpayer had two separate trades or businesses, the food packaging business and the business of leasing food packaging plants, and the loan involved was made pursuant to the latter business. There was no claim of the loss being sustained in the business of promoting or organizing businesses. In Commissioner v. Stokes' Estate, supra, a major portion of decedent's lifetime, thought, and energy was devoted to the business of exploiting patents. Petitioner fails to come within the sweep of these cases. His promoting, organizing, and financing did not occur during normal business hours. The income from these activities was sparse, constituting a very small part of petitioner's total income. H. Beale Rollins, supra.
During the period 1946-1959, petitioner participated in 7 ventures not parts of his successive trades or businesses, although 4 of these were in allied areas. [4] The other *33 3 were mere loans where petitioner's sole activity was in protecting his investment. Petitioner did not hold himself out to others as selling his services in promoting, organizing and financing businesses. Deputy v. du Pont, 308 U.S. 488 (1940) (concurring opinion). Petitioner never claimed his business to be that of a promoter of enterprises, nor did such business ever constitute his regular, time-consuming activity. Petitioner has failed to meet the test mentioned in A. Kingsley Ferguson, 16 T.C. 1248, 1257 (1951): The criterion is obviously whether the occupation of the party involved so consists of expenditure of time, money, and effort as to constitute his business life. * * * We conclude that petitioner has failed to sustain his burden of proving that his activities during the period 1946-1959 were so extensive, and that the time spent thereon was so substantial, as to constitute the separate *34 trade or business of promoting, organizing, and financing businesses. In addition, petitioner treated the gain from the sale of his interest in Soundies Films, Inc., as a long-term capital gain on his 1950 and 1951 income tax returns. If petitioner was, as he claimed, in the business of buying distressed businesses, building them up, and then disposing of them, they would be held out for sale to customers in the ordinary course of his trade or business, and thus not be entitled to capital gains treatment. [5]Thomas Reed Vreeland, 31 T.C. 78 (1958). Finally, even if petitioner were a promoter, and assuming without deciding that the loan to Abbate and the employment contract were integral parts of a single transaction, petitioner would still not be entitled to a deduction. He did not promote or organize Independent, nor did he manage or finance it. His sole activity consisted of a personal loan to Frank Abbate. There was no showing that Abbate was a mere conduit for the funds to Independent, nor that Independent issued its notes as collateral. Since petitioner does not purport to be in the trade or business *35 of lending money, and the record does not indicate him to be, petitioner's loans to Abbate would fall outside of any promotional business even if one did exist. Thomas Reed Vreeland, supra. Petitioner's second argument is an ingenious effort at elevating himself by his own bootstraps. Petitioner correctly contends that income in the form of compensation is income from a trade or business. Rev. Rul. 55-600, 1955-2 C.B. 576. He then contends that the loan and employment contract were one transaction, that the loan thereby became part of a transaction producing income from a trade or business, and that the loss on the loan is a business bad debt because it arose in a transaction which produced business income. The statutory language is explicit. Section 166(d)(2), supra, defines a nonbusiness debt as a debt not created or acquired in connection with a trade or business, or a debt the loss from which is not incurred in a trade or business. Since we have found petitioner not to be in the business of promoting, organizing, and financing businesses, petitioner's second argument must require a finding that petitioner was in the trade or business of a market adviser and consultant, and that *36 the loans proximately related to such trade or business. Max M. Barish, supra; S. D. Ferguson, 28 T.C. 432 (1957), affd. 253 F. 2d 403 (C.A. 4, 1958). Such a conclusion is not supported by the facts and was denied at the trial by petitioner. Petitioner is incorrect in alleging that the mere receipt of income in the form of compensation for services rendered will of itself put the recipient for all purposes into the trade or business of performing those services. Petitioner's theory would allow any creditor to obtain a deduction for bad debts incurred, acquired or created outside his trade or business by the simple expedient of putting himself on the debtor's payroll. Jan G. J. Boissevain, 17 T.C. 325 (1951). Deductions are a matter of legislative grace, Deputy v. du Pont, supra, and petitioner has failed to clearly come within the statutory definition. New Colonial Co. v. Helvering, 292 U.S. 435 (1934). We need not and do not decide the difference in scope between the phrase "trade or business" when descriptive of income categories and the same phrase when referring to deductions. We do hold that petitioner has failed to prove that he created, acquired or incurred the loss *37 herein involved in the trade or business of market adviser and consultant in 1950 or 1954. Since the loans to Abbate were not proximately related to any trade or business, within the meaning of section 166(d), during the years 1950 and 1954, we hold that the losses on those loans must be treated as a loss from the sale of a capital asset held for not more than 6 months. Decision will be entered for the respondent. Footnotes
1. On petitioner's 1951 Federal income tax return a long-term capital gain is reported on part of the proceeds from Soundies Films. Petitioner claimed that his cost had been used in a 1950 sale. 2. Tri-Jay was liquidated in 1951. The assets were contributed to Masterform Tool Company, a partnership. ↩
3. The exact amounts reported in petitioner's income tax returns for 1951-1954 are shown below. ↩
4. The exact amounts reported in petitioner's income tax returns for 1951-1954 are shown below. ↩
5. The amounts do not appear in the record. ↩
6. Ashland Screw Products, Inc., merged into Pokorney Value Company in 1959, after petitioner had purchased the remaining 50% of the Ashland stock from his partner in Slidematic.↩
*. Additional liquidation proceeds from sale of Soundies Films, Inc.↩
**. From loan to Tri-Jay Masterform Tool Company.↩
1. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. ↩
2. All references to the Internal Revenue Code are to the I.R.C. of 1954.↩
3. SEC. 166. BAD DEBTS. * * *
(d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a taxpayer's trade or business; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
4. Film Guild of America, Inc., and Hollywood Recorded Features, Inc., were closely related to petitioner's film distributing business. Ashland Screw Products Company was interspersed with the sale of metal stampings, and Pokorney Valve Company consisted in part of the screw products venture.↩
5. Sec. 117(a)(1)(A), I.R.C. of 1939 as amended, now sec. 1221(1), I.R.C. of 1954↩.